## NORTHERN PAC. R. CO. v. HUSSEY.

(Circuit Court of Appeals, Ninth Circuit. April 2, 1894.)

No. 122.

1. RAILROAD LAND GRANTS—UNSURVEYED LANDS—TENANTS IN COMMON.

A land-grant railroad company is not a tenant in common with the United States in respect to lands which lie within its grant limits, opposite the completed line, but which have not yet been surveyed, so as to render the odd sections belonging to the company distinguishable from the even sections reserved to the government.

2. SAME—ENJOINING TRESPASSERS.

The company has, however, such an interest in the lands as will entitle it to maintain alone (the government having refused to join with it) a suit to enjoin trespassers who are cutting timber from the lands in such manner that the denuded portions will fall within the odd, as well as the even, sections when the survey is made.

Appeal from the Circuit Court of the United States for the District of Montana.

This was a suit by the Northern Pacific Railroad Company to enjoin John O. Hussey from cutting timber from certain lands. The circuit court having sustained a demurrer to the bill, and dismissed the cause, complainant appealed.

J. K. Toole and Fred. M. Dudley, for complainant.

Thos. C. Bach (Lewis Penwell, of counsel), for respondent.

Before McKENNA and GILBERT, Circuit Judges, and ROSS, District Judge.

ROSS, District Judge. The bill, to which a demurrer was sustained by the court below, was brought by the Northern Pacific Railroad Company to enjoin the appellee from cutting, felling, and removing timber from unsurveyed lands within 40 miles of the road the company named was authorized to build, and did build, under and pursuant to the provisions of the act of congress approved July 2, 1864 (13 Stat. 365), entitled "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget's sound on the Pacific coast," by which act the Northern Pacific Railroad Company was incorporated, and power conferred upon it to locate, construct, and maintain a continuous railroad and telegraph line from Lake Superior, by the most eligible railroad route, on a line north of the 45th degree of latitude, to a point on Puget sound, with a branch, by way of the valley of the Columbia river, to a point at or near Portland. To aid in the construction of the road the company was, by the third section of the act, granted, subject to certain exceptions not here necessary to be stated—

"Every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said

railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said road whenever it passes through any state; and whenever on the line thereof the United States have full title not reserved, sold, granted, or otherwise appropriated, and free from preemption or other claims or rights at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office."

The third section of the act further provided that:

"Whenever prior to said time. any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or preempted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections.   *   *   *"

By the sixth section it was enacted:

"That the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad.  And the odd sections of land hereby granted shall not be liable to sale or entry or preemption before or after their survey except by, said company, as provided in this act; but the provisions of the act of September, eighteen hundred and forty-one, granting preemption rights, and the acts amendatory thereof, and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May twentieth, eighteen hundred and sixty-two, shall be, and the same are, hereby extended to all other lands on the line of said road when surveyed, excepting those hereby granted to said company.  And the reserved alternate sections shall not be sold by the government at a price less than two dollars and fifty cents per acre when offered for sale."

The bill alleges that the complainant accepted the grant, and located and constructed the line of railroad and telegraph it was authorized to build, completing the construction thereof prior to the year 1888; that the portion of the line of the road opposite the lands constituting the basis of this suit was definitely located, and a plat thereof filed in the office of the commissioner of the general land office, July 6, 1882, and its construction completed early in 1883, and accepted by the president on the 8th of May of that year.  It is alleged that the lands respecting which the suit is brought have not been surveyed by the government, but are within 40 miles of the complainant's road, and, when surveyed, will fall within township 11 N. of range 6 E. of the principal Montana meridian; that none of these lands are, or ever have been, known mineral lands, but are nonmineral in character; that they are broken and mountainous, not adapted to agricultural pursuits, but are covered with a heavy growth of timber, for which alone they are valuable; that these lands were, on July 2, 1864, and at the time of the definite location of the complainant's road, and of the filing of the map thereof in the office of the commissioner of the general land office, public lands of the United States, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights; that all of the said lands belong either to the complainant or to the United States, complainant's right and title thereto being that conveyed by the aforesaid act of congress; that the United States have neglected to cause the said lands to be surveyed, al-

though requested to do so by complainant, for which reason it is impossible that the lands embraced by the grant to the complainant can be distinguished from those owned by the government; that, notwithstanding these facts, the defendant, in October, 1892, after making application to the land department of the government for permission so to do, and the refusal of his petition, entered, without any right, authority, or permission, upon the said body of unsurveyed lands, including what will be, when surveyed, odd-numbered as well as even-numbered sections, and commenced to cut down the timber thereon, and to manufacture the same into saw logs, lumber, and other merchantable commodities, and to remove the same therefrom, and to sell and dispose thereof for speculation and purposes of merchandise; that he has so cut 850,000 feet of saw logs, and threatens to and will, unless restrained by the court, continue to cut, remove, and dispose of the timber on said lands, to the irreparable damage of the complainant; that the complainant has heretofore requested the United States to join with it in actions to protect the timber upon the said lands, but that the request was refused. Complainant accordingly brought the present suit alone, and insists that it is entitled to the injunction asked—First, upon the ground that complainant and the United States are tenants in common of the unsurveyed lands in question; and, second, that, if this be not so, still complainant has such an interest in the protection of all the unsurveyed lands within the limits of its grant as entitles it to maintain the suit.

Are the complainant and the United States tenants in common of the body of unsurveyed lands within the limits of complainant's grant? That the title of the railroad company attached to the lands embraced within the primary limits of its grant at the time the route of the road was definitely fixed and a plat thereof filed in the office of the commissioner of the general land office, and related back to the date of the grant, is settled by decisions of the supreme court so numerous as to render their citation no longer necessary. True, the grant was upon the condition subsequent that the company build the road, which condition the bill shows complainant complied with. The grant to the Northern Pacific Railroad Company, therefore, attached on July 6, 1882, as of July 2, 1864, to all of the granted lands; and, as it was for 20 alternate sections per mile of the nonmineral public lands, designated by odd numbers, to which the United States had full title, on each side of the road through the territories, and as Montana was at those dates a territory, and the United States then held, according to the averments of the bill, full title to all of the lands in question in this suit, the grant attached at and of the dates mentioned to 20 alternate odd-numbered sections per mile of the public lands in question on each side of the road. The even-numbered sections within the same limits remained the property of the government. The grant was made with reference to the system of surveys established by the United States in respect to its lands, and, as has been seen, the very act making the grant declared that the president should cause the lands to be surveyed for 40 miles in width

on both sides of the entire line of road, after its general route should be fixed, and as fast as required by its construction. Such survey was manifestly essential, for, without it, it could not be known which were odd-numbered sections and which even-numbered.

While it is impossible to distinguish the lands granted to the railroad company from those retained by the government until the survey is made, it needs only a survey in accordance with established statute rules to distinguish those of the railroad company, in which the government has no interest, from those of the government, in which the railroad company has no interest. Tenants in common of a tract of land, although their estates be several, have each an undivided interest in the whole, and we are unable to understand how it can with propriety be said that a grantee of specific parts only has an undivided interest in the whole. The decisions of the supreme court relied on by the appellant to sustain its position in this respect are unlike the present case. The act of congress involved in Railroad Co. v. Litchfield, 23 How. 66, granted to Iowa an undivided half of the whole tract of land lying on each side of the Des Moines river from Raccoon Fork to the Missouri line, at the same time conferring on the executive officers of the government the power to make partition of the land between the government and the grantee. In Doe v. Wilson, 23 How. 457, it appeared that by a treaty made by the government with the Pottawatomie tribe of Indians, by which that tribe ceded to the United States their title and interest in certain lands, certain reservations were made to Indian villagers and to individual Pottawatomies, among others to Pet-chi-co, two sections. The sections so reserved were not otherwise described, but the treaty provided that they should be "selected under the direction of the United States after the land shall have been surveyed, and the boundaries shall correspond with the public surveys," and that patents should be issued by the government to their respective owners. In principle, that case was much like those Mexican grants, of which Frasher v. O'Connor, 115 U. S. 102, 5 Sup. Ct. 1141, was one, where a certain quantity of land was granted to be located by the government within defined boundaries containing a larger quantity. In each of those cases the grantee, being entitled only to the specific quantity named, which might be located on any part of the whole tract, manifestly had an undivided interest in the whole until the quantity to which he was entitled should be set apart to him in severalty. Not so, however, in the case at bar, where, by the grant, the title conferred upon the railroad company was confined to certain specific sections of land, all of which became vested by the grant in the company, and which needed only the government survey to distinguish them from the adjoining sections, of which the government remained the sole owner. But, because it cannot be properly held that the complainant and the United States are, prior to its survey, tenants in common of the entire body of lands within the limits of the grant to the railroad company, does it necessarily follow that a trespasser may, with impunity, go upon the lands, and cut down and destroy or carry away the timber growing upon them? The bill shows that the lands in question are alone

valuable for the timber that grows upon them.    To cut down, destroy, or carry away the timber thereon is, therefore, essentially to destroy and take away the very substance of the estate.    That an injunction will be awarded, in behalf of one showing the necessary interest in the property, to prevent such waste and destruction, is thoroughly settled.    Erhardt v. Boaro, 113 U. S. 537, 5 Sup. Ct. 565.

It is apparent that the complainant has no adequate remedy at law.    It cannot maintain an action for damages for the cutting of any tree or trees upon the lands in question, or any other action at law, for the reason that it would be essential to the maintenance of such an action for the plaintiff to show that the particular tree or trees for the cutting of which damages were claimed, or other relief was asked, came from the land of the plaintiff; and this, as has been seen, is impossible to be shown in advance of the government survey.    Yet the bill shows that the defendant, without any right or authority whatever,—in other words, as a mere trespasser, —has entered upon the body of unsurveyed lands within the limits of the grant to complainant, and, for purposes of speculation and sale, has commenced to cut down the timber thereon, and to manufacture the same into saw logs, lumber, etc., and has so cut $50,000 feet of saw logs, and will, unless restrained, continue those illegal acts, and thus remove the very thing which constitutes the chief, if not the only, value of the lands.    Every tree already felled by the defendant, and every tree intended to be cut by him, in the prosecution of his undertaking, necessarily impairs the value of the complainant's interest in its grant, for the condition of the lands within the grant limits necessarily renders it uncertain and impossible to ascertain how many of such trees have been or will be cut from the lands belonging to complainant.    This very uncertainty would seem to vest in such grantee the right to protect the whole as against a mere trespasser and wrongdoer.    In the case of Ross v. McJunkin, 14 Serg. & R. 364, land warrants had been issued to John and William Menough,—to John for 300 acres, and to William for 200 acres,—which had been surveyed together, and a general diagram of survey returned, which contained no division line, nor anything to distinguish the one tract from the other.    The parties to that action, which was ejectment, derived their titles respectively from John and William Menough, and Gibson, J., speaking for the supreme court of Pennsylvania, said:·

. "The nature of the interest which the original owners of the warrants held under their joint survey will go far to settle the rights of the parties before us. They were grantees from the state, not of an undivided interest in the whole, but of separate and distinct parts of the whole; consequently, they were not tenants in common.    The grant to the one would not have entitled him to possession in common of the whole; nor, if one had been disseized, could he have recovered an undivided portion from the other.    The truth is that the survey was imperfect, and, although a valid appropriation of the land as to strangers, it left their rights, as between themselves, suspended till the subject of the grant to each should be specifically designated by the proper officer, or by themselves."

The bill, however, in the present case alleges that the acts complained of are committed by the defendant upon what, when surveyed, will be odd-numbered sections, as well as what will be even-numbered sections, of the lands within the grant limits. The case is a novel one, it must be admitted, but where so great a wrong is being perpetrated, as must be taken to be true for the purposes of the present decision, and the party seeking to prevent the wrong has no adequate remedy at law, equity, we think, will afford the remedy. "Ubi jus, ibi remedium," is the maxim which forms the root of all equitable decisions. And responding to the objection that certain orders issued in the case of Toledo, etc., Ry. Co. v. Pennsylvania Co., 54 Fed. 751, were without precedent, the court said:

"Every just order or rule known to equity courts was born of some emergency,. to meet some new conditions, and was, therefore, in its time without precedent. If based on sound principles, and beneficent results follow their enforcement, affording necessary relief to the one party without imposing illegal burdens on the other, new remedies and unprecedented orders are not unwelcome aids to the chancellor to meet the constant and varying demands for equitable relief."

Judgment reversed, and cause remanded to the court below, with directions to overrule the demurrer to the bill, with leave to the defendant to answer.