OLIVE LAND & DEVELOPMENT CO. v. OLMSTEAD et al.

(Circuit Court, S. D. California. July 9, 1900.)

1. PUBLIC LANDS—EFFECT OF UNAUTHORIZED MINING LOCATION.
   The location as an oil placer mining claim of public lands upon which no discovery of oil had been made vests the locators with no rights in such lands as against the United States, or as against one subsequently acquiring the title thereto or rights therein from the United States by any legal means prior to any such discovery.

2. SAME—RIGHTS OF ENTRYMAN—CHARACTER OF LANDS.
   One entering public lands, who has paid the purchase price, or performed all the conditions requisite to entitle him to a patent therefor, is vested with the equitable title, and his right to a patent can only be defeated by a finding by the land department that he was not qualified to acquire the title, or that the land was not subject to his entry, and the character of the land is to be determined by the facts as known to exist at the date of such entry. His rights cannot be affected by any subsequent discovery of mineral, or of any other fact which would take the land out of the class in which it stood when the entry was made.

3. SAME—PRIVATE LANDS INCLUDED IN FORESTRY RESERVATION—SELECTION BY OWNER OF OTHER LANDS.
   Under the provisions of Act June 4, 1897 (30 Stat. 11, 35, 36), relating to forestry reservations, which give the owner of, or bona fide settler on, a tract of land which may be included within the limits of a public forestry reservation, the right to relinquish the same and select in lieu thereof a tract of vacant land open to settlement, not exceeding that relinquished in area, where a patentee of such a tract relinquishes the same, and selects in lieu thereof a tract which appears by the books of the land office to be vacant and open to settlement, and files his selection in the land office, he becomes at once the equitable owner of the land so selected; and his right to a patent therefor is not affected by the fact that it is situated in the vicinity of producing oil wells, and that it has surface indications of oil, or that it was selected with a view of its possible value as oil land, where no discovery of oil has ever been made thereon.

4. SAME—RIGHTS OF ENTRYMAN—SUIT TO PROTECT EQUITABLE TITLE.
   One acquiring the equitable title to land by selecting the same under such act in lieu of land which he held by patent and surrendered to the government may, prior to the issuance to him of a patent therefor, maintain a suit in equity to enjoin a defendant from sinking oil wells thereon and taking oil therefrom.

In Equity. Suit to quiet title, and to enjoin trespasses on land claimed by complainant under an entry from the United States, but

to which no patent had been issued. On motion for preliminary injunction, demurrer to bill, and motion by complainant for judgment on the pleadings.

Edwin A. Meserve and Shirley C. Ward, for complainant.

M. W. Conkling, for defendants.

ROSS, Circuit Judge. The act of congress of June 4, 1897, entitled "An act making appropriations for sundry civil expenses of the government for the fiscal year ending June thirtieth, eighteen hundred and ninety-eight, and for other purposes," contains, among other things, various provisions in respect to forest reservations, commencing with the declaration that:

"No public forest reservation shall be established, except to improve and protect the forest within the reservation, or for the purpose of securing favorable conditions of water flows and to furnish a continuous supply of timber for the use and necessities of the citizens of the United States; but it is not the purpose or intent of these provisions, or of the act providing for such reservations, to authorize the inclusion therein of lands more valuable for the mineral therein or for agricultural purposes than for forest purposes,"—and including this provision: "That in cases in which a tract covered by an unperfected bona fide claim, or by a patent, is included within the limits of a public forest reservation, the settler or owner thereof may, if he desires to do so, relinquish the tract to the government and may select in lieu thereof a tract of vacant land open to settlement not exceeding in area the tract covered by his claim or patent; and no charge shall be made in such cases for making the entry of record or issuing the patent to cover the tract selected; provided further, that in cases of unperfected claims the requirements of the laws respecting settlement, residence, improvements and so forth are complied with on the new claims, credit being allowed for the time spent on the relinquished claims." 30 Stat. 11, 35, 36.

The present is a suit in equity to quiet the complainant's alleged title to lots 1 and 5 of the fractional N. W. ¼ of section 4, township 4 N., range 18 W., San Bernardino base and meridian, situated in Ventura county, Cal., alleged to have been acquired by the complainant's predecessor in interest, one J. R. Johnston, who is alleged to have selected the land under the above provisions of the act of June 4, 1897, in exchange for patented land within a forest reserve surrendered by said Johnston to the government. The bill includes a prayer for an injunction enjoining the defendants from the commission of their alleged unlawful threatened acts of entering upon the lands in controversy and boring for and extracting any oil that may be found therein. Upon reading the bill an order was made requiring the defendants to show cause why an injunction should not be granted as prayed for by the complainant, and why the temporary restraining order granted by the court should not be continued pending the litigation. In response to the order to show cause the defendants appeared and filed a demurrer to the bill, as also a verified answer thereto. The complainant, claiming that the answer raised no material issue of fact, moved for judgment on the pleadings, which motion was, by the stipulation of counsel for the respective parties, heard with the demurrer and the order to show cause. From the pleadings it appears that on the 20th day of January, 1900, Johnston was the owner in fee simple, free of any lien or incumbrance, of lot 2 in section 5 of township 4 N., range 15 W., San Bernardino base and meridian, situated in Los

Angeles county, Cal., and within the limits of a public forest reservation, containing 36.81 acres, which land was then and still is a nonmineral tract, covered by patent issued by the United States; that on the 22d day of May, 1900, lot 1 of the fractional N. W. ¼ of section 4, township 4 N., range 18 W., S. B. M., containing 26.40 acres, and lot 5 of the fractional N. W. ¼ of said section 4, containing 10.41 acres, aggregating 36.81 acres, were, and for more than one year continuously theretofore had been, surveyed, unappropriated, and (unless otherwise shown by facts hereinafter stated) vacant public land of the United States, returned and characterized upon the official records of the United States as nonmineral land, free and open to entry and settlement under the laws of the United States, and did not then and does not now contain any known mines, salines, or minerals, petroleum, or mineral oil; that on January 20, 1900, Johnston, desiring to avail himself of the benefits of the above-mentioned act of congress, relinquished and conveyed the two tracts of which he was so the owner to the United States, and recorded the deed in the office of the recorder of the county in which the lands are situated, and on the 22d of May, 1900, filed with the register and receiver of the United States land office at Los Angeles, Cal., the said deed so recorded, together with his selection in lieu thereof of the two tracts first herein described, together with a full, true, and correct abstract of his title to the relinquished lands, duly certified as such by the county recorder of the county in which the lands are situated, showing him to be such owner in fee simple, free of any lien or incumbrance, immediately prior to the time the deed to the United States was made and recorded; that on the said 22d day of May, 1900, the register and receiver of the land office accepted, received, and filed the application of Johnston, and duly entered the same upon the official records of the land office, and the register thereof did then and there certify that the land so selected was free from conflict, and that there was no adverse filing, entry, or claim thereto; and that on the next day, to wit, May 23, 1900, Johnston, by an instrument in writing, sold and conveyed all his right, title, and interest in the selected land to the complainant. The facts thus alleged by the complainant are not denied by the answer of the defendants, except as hereinafter stated, although the legal conclusions alleged by the complainant to flow from them are denied. The answer avers that the land in controversy is of no agricultural value, and of but little, if any, value for grazing purposes, and has no appreciable value for any purpose except for petroleum that may be obtained by boring or drilling therein; that it is in a well-recognized petroleum-producing belt, and that adjacent properties in the belt are actually producing petroleum in large and profitable quantities, and that the surface indications of such producing lands and upon the lands in controversy are the same; that the surface rock and sand and the surface geological formation and stratification upon the lands in controversy are such as would lead any experienced petroleum expert or any practical geologist familiar with petroleum-bearing lands in California to pronounce the same oil or petroleum territory, and chiefly valuable therefor; that one of the most pronounced and well-marked anticlinal folds of sandstone and shale formation in Ventura

county runs through the land in controversy and has its apex thereon, and that where said anticlinal fold is most exposed, by a declivity which sharply cuts the same, bituminous sand several feet in thickness and 100 or more feet long is clearly visible, which sand, when excavated, gives out a distinct odor of petroleum; that such bituminous sand, in the formation in which it is found, shows the land in controversy to be mineral or petroleum in character, and constitutes such a discovery as would justify any prudent petroleum miner in locating the same as petroleum land, and in spending his time and money in developing the same for its petroleum product; that in October, 1899, discovery of bituminous sand in said sandstone and shale formation having been made upon the land in controversy by eight persons, then citizens of the United States, and over the age of 21 years, they did then and there locate the fractional N. W. $\frac{1}{4}$ of said section 4, including the lands in controversy, as placer petroleum lands and as a placer petroleum mining claim, under the name of "La Bonita Oil Claim," pursuant to the laws of the United States, and did then and there clearly mark and define the boundaries thereof by substantial monuments, so that the corners might be readily found and the boundaries readily traced upon the ground; that thereafter, and prior to May 22, 1900, the said locators, by a written instrument, duly conveyed all their interest in the said mining claim to the defendants to this suit, by virtue of which they allege that they are now the owners of the lands in controversy, and entitled to their exclusive use and possession, and entitled to excavate and to bore and drill thereon for petroleum, and to take therefrom, when found, any petroleum that may be obtained.   The answer also alleges that. Johnston did not select the lands in controversy for their agricultural or grazing value, or for any purpose, except to obtain thereby the undiscovered petroleum that might be found therein, of all of which the complainant had knowledge, and that the selection by Johnston under the act of congress referred to, for the purpose stated, was fraudulent and in violation of the spirit and purpose of the act of congress under which he pretended to proceed.   The defendants assert, both in their answer and in argument, that no title vests under a selection of forest reserve lieu land until patent therefor issues, or until approval of the selection by the commissioner of the general land office, and that until such time such selected land is open to mineral discovery and mineral development, and that, if such discovery and development show the land to be more valuable for mineral than agricultural purposes, the attempted selection fails.   It is also contended on the part of the defendants that the land in controversy was mineral when selected by the predecessor of the complainant, and therefore not subject to selection under the provisions of the act of congress above referred to; and this, because of its alleged surface indications and of the character of the adjacent land, and because of the alleged opinions that oil experts would express respecting it.   The complainant controverts the position of the defendants in respect to the character of the land in question at the time of the location under which the defendants claim and since, and further insists that a selection of land under the act of congress of June 4, 1897, in lieu of patented land surrendered

to the government, operates eo instanti to vest the full and complete equitable title in the selector, provided the land selected was at the time of selection "vacant and open to settlement," and that no subsequent discovery of mineral thereon can impair such title, nor alter the legal character of the land; and, further, that all public lands returned as agricultural are "vacant and open to settlement" whenever they are unappropriated on the books of the local land office, and contain no known salines or mines or producing oil wells, although they may contain some mineral, and be included within a mining location that would be valid as between rival mineral claims.

The great importance that the oil industry has already assumed in this state, the enormous value of oil-producing lands, and the consequent avidity with which they are sought, coupled with the fact that the present suit will serve as a precedent for others now pending, has induced the court to take the case up out of its order, and to give to the questions presented careful consideration, to the end that the law upon the subject may be speedily settled, and the way indicated by which the title to such lands may be acquired, and the important industry referred to encouraged and developed. In the case of Gird v Oil Co. (C. C.) 60 Fed. 531, 532, this court pointed out that the government title to oil-bearing lands can only be acquired, under existing laws, pursuant to the provisions of the mining laws relating to placer claims. And in the very recent case of Nevada-Sierra Oil Co. v. Home Oil Co. (C. C.) 98 Fed. 673, it was here decided, as it had been many times before by other courts, as well as by the land department of the United States, that mere indications, however strong, are not sufficient to answer the requirements of the statute of the United States relating to placer as well as lode claims, which requires, as one of the essential conditions to the making of a valid location of unappropriated public land of the United States under the mining laws, a discovery of mineral within the limits of the claim. That decision seems to have occasioned surprise among those seeking to acquire from the government lands supposed to contain oil although it was, as was shown in the opinion delivered at the time, in strict accord with the provisions of the statute, and is abundantly supported by the authorities. Davis' Adm'r v. Weibbold, 139 U. S. 507, 522, 11 Sup. Ct. 628, 35 L. Ed. 238; Dughi v. Harkins, 2 Land Dec. Dep. Int. 721; Cleghorn v. Bird, 4 Land Dec. Dep. Int. 478; Commissioners v. Alexander, 5 Land Dec. Dep. Int. 126; and numerous cases cited in Davis' Adm'r v. Weibbold. It is a matter of common knowledge that, in consequence of the decision in the case of Nevada-Sierra Oil Co. v. Home Oil Co., strenuous efforts were made by strong and influential organizations to induce congress at its last session to dispense with the necessity of an actual discovery of oil as a basis of acquiring such lands under the placer mining laws, and to provide that certain indications of the existence of such mineral should be sufficient evidence of the mineral character of the land; but all of these efforts were unsuccessful, and the law remains the same in that respect as before. Applying the law to the facts as made to appear by the pleadings in the present case, it is clear that the location of the lands in controversy by the predecessors in interest of the defendants in October, 1899, under the

statute relating to placer claims, amounted to nothing, for the reason that no discovery of oil or other mineral had then been made, nor, indeed, has yet been made, in or upon any part of the lands in controversy. It is not pretended that the defendants or their predecessors remained in the actual possession of any part of the premises; and, if they had, the law is well settled that mere occupancy of the public lands and improvements thereon give no vested right therein as against the United States, and consequently not against any purchaser from them. Neither the defendants nor their predecessors in interest had made such a location as prevented the lands from being, in law, vacant. Others had the right to enter upon the lands for the purpose of taking them up under the mining laws, if it could be done peaceably and without force, or to acquire the government title thereto by any other legal means. Sparks v. Pierce, 115 U. S. 408, 413, 6 Sup. Ct. 102, 29 L. Ed. 428; Belk v. Meagher, 104 U. S. 279, 287, 26 L. Ed. 735; Garthe v. Hart, 73 Cal. 541, 15 Pac. 93; Horswell v. Ruiz, 67 Cal. 111, 7 Pac. 197; McCormick v. Varnes, 2 Utah, 355; Hopkins v. Noyes, 4 Mont. 550, 2 Pac. 280. The real question in the case, therefore, is whether the proceedings taken under the act of congress of June 4, 1897, by the predecessor in interest of the complainant, conferred upon him and his grantee such a right in the lands in controversy as will enable the complainant to maintain its bill.

The statute in question is a plain standing offer on the part of the government to exchange any of its land that is vacant and open to settlement for a like quantity of similar land within a forest reservation, for which it had previously issued a patent, or to which an unperfected bona fide claim had been acquired, provided that in cases of unperfected claims the requirements of the laws respecting settlement, residence, improvements, and so forth, are complied with on the new claims, credit being allowed for the time spent on the relinquished claims; the owner of or settler on the tract within the reservation, in the event of his acceptance of the offer, being required to relinquish his tract to the government, in consideration of which he is given the right to select in lieu thereof a tract of vacant land open to settlement, not exceeding in area the tract covered by his patent or claim, as the case may be, with the further provision that no charge shall be made for making the entry of record, or issuing the patent to cover the tract selected. From these provisions it is clear that, in such cases of exchange, title is to be given by the government for title received, and in cases of unperfected claims the claimant is to occupy a precisely similar status in respect to the tract selected that he did regarding that relinquished. In all cases the land authorized to be selected in lieu of that relinquished is required to be vacant and open to settlement. When? Manifestly, at the date of selection. It is upon its then character and condition that the selector has the right, and is bound, to act. Before making his selection he must inform himself of the character and condition of the tract desired, but it would be wholly unreasonable to say that he is required to make a selection based upon what may be disclosed in that regard in the future. The right to select is by the statute given to the party invited by the government to make the exchange, without other condition than that

the land selected shall be vacant and open to settlement. Neither the act of the selector, however, in making the selection, nor that of the officers of the local land office, upon whose books the selected tract appears to be vacant and open to settlement, in accepting and filing the selection, is conclusive of the then character and condition of the land. Presumptively, the character and condition of the selected tract is such as is indicated by the books of the land office, and therefore, the selection, with the approval of the officers of the local land office, of a tract appearing upon the books as vacant and open to settlement, in lieu of a similar tract of like dimensions relinquished to the government, gives an equity in the selector which entitles him to protection until the fact in respect to the character and condition of the selected land is, upon proper notice to the equity claimant, otherwise determined by the land department. The right to make that inquiry extends to the time of the issuance of the patent contemplated and provided for by the statute. Hawley v. Diller (decided May 28, 1900) 178 U. S. 476, 20 Sup. Ct. 986, Adv. S. U. S. 986, 44 L. Ed. ——; Lumber Co. v. Rust, 168 U. S. 589, 593, 18 Sup. Ct. 208, 42 L. Ed. 591; Knight v. Association, 142 U. S. 161, 12 Sup. Ct. 258, 35 L. Ed. 974. But this inquiry, as has been said, is limited to the character and condition of the land at the time of its selection. One reason for this has already been stated, namely, that, while the selector under the act in question may and must inform himself in regard to the then character and condition of the land he desires to take in exchange for that relinquished, it would be altogether unreasonable to hold that he is required to make a selection based upon what may be disclosed in that regard in the future. And, turning to the act under consideration, it is seen, as has already been observed, that the power to "select" is by the statute given to the party who is invited to make the exchange, provided always that he confines his selection to the class of lands described in the statute, to wit, those vacant and open to settlement. No other condition is imposed by the statute. The act in question differs very materially in this respect from the indemnity clauses of many of the railroad and other grants, requiring the selections to be made by and with the advice, consent, direction, or approval of some officer of the land department, in which case such consent or approval is deemed a condition precedent to the vesting of any interest in the selected land. The present case is quite similar to that of Culver v. Uthe, 133 U. S. 655, 10 Sup. Ct. 415, 33 L. Ed. 776, the facts of which were that one Uthe had a patent from the United States for the land there in controversy, dated February 10, 1851, which purported on its face to be issued under the act of congress of February 11, 1847 (9 Stat. 123), on a military land warrant that he had deposited in the general land office. This land warrant was located on the land then in question at the land office of the United States in Chicago, Ill., on July 10, 1850, under the authority of Uthe himself; and the land-warrant certificate was delivered up, and the patent aforesaid issued to him in due time, and after the proper course of proceedings. The defendant to the action relied upon the fact that the land was swamp land, within the meaning of the act of congress of the 28th of September, 1850 (9 Stat. 519); that by that statute the title to the land was transferred to

the state of Illinois between the time of the location of the military land warrant and the issuance of the patent for it to Uthe, and that therefore the title claimed under Uthe failed, being vested by that statute in the state of Illinois,—the act being a grant in præsenti, and taking effect at its date. The supreme court said:

"Under an act of congress which authorized it to be done, Uthe, by directing his land warrant to be located upon this land and delivering up the warrant, and by the proceedings of the land office upon that location, which resulted in issuing a patent to him for the land, had acquired an equitable title to the land, or what may be called a vested interest in it, prior to the passage of the swamp land act by congress. He had done what by the act of congress of 1847 (9 Stat. 123), entitled him to the land on which his warrant was located. He had delivered up the land warrant,—the evidence of his claim against the government. He had received in exchange for it the certificate of the receiver and register of the land office, and these entitled him to a patent after such delay as was necessary to ascertain the fact that the land had been granted to no one else, and that all his proceedings were regular, which facts were to be determined by the commissioner of the general land office, and which were determined in his favor. He had paid for this land. He had paid by the delivering up and cancellation of his land warrant. He had received the certificate of the register and receiver of the land office at Chicago, which, by the laws of nearly all the Western states, have been made equivalent to the title to the land in actions of ejectment, though the strict legal title remained in the United States at the date of the passage of the swamp land act. Are we to suppose that congress intended to give to the state of Illinois the land which it had already, by a contract for which value was received, promised to convey to Uthe? As the grant to the states of the swamp land within their jurisdiction was a gratuity, although accompanied with a trust for the reclamation of said land, it is not easily to be supposed that congress intended to be thus generous at the expense of parties who had vested rights in any of the lands so donated, derived from the United States."

It is true that in the case just cited a certificate had been issued by the register and receiver of the local land office in lieu of the land warrant surrendered, while here nothing more was done by the register and receiver of the local land office than to receive the deed for the relinquished land, together with the certificate of title thereto, and to accept and file the selection of the tract selected in lieu thereof. But in the present case nothing more was required to be done. The statute makes no provision for the issuance of any certificate by the register and receiver to the selector, or for the issuance to him of any other instrument than a patent. It is well settled that in purchases of land from the government, where one has paid the full purchase price and done all that he is called upon to do by the terms of the statute, he has acquired an equitable title to the property bought. In Benson Mining & Smelting Co. v. Alta Mining & Smelting Co., 145 U. S. 428, 12 Sup. Ct. 877, 36 L. Ed. 762, it was sought to defeat the title of a mining claimant to his mine, after he had paid the complete purchase price therefor and received a certificate of purchase, by showing that he had not complied with the terms of the United States statute which requires that not less than $100 worth of labor be performed or improvements made each year "until a patent has been issued therefor." The supreme court, in denying the soundness of the proposition, said:

"It is a general rule in respect to the sales of real estate that when a purchaser has paid the full purchase price his equitable rights are complete, and

there is nothing left in the vendor but the naked legal title, which he holds in trust for the purchaser. And this general rule of real-estate law has been repeatedly applied by this court to the administration of the affairs of the land department of the government; and the ruling has been uniform that whenever, in cash sales, the price has been paid, or, in other cases, all the conditions of entry performed, the full equitable title has passed, and only the naked legal title remains in the government, in trust for the other party, in whom are vested all the rights and obligations of ownership."

To the same effect are Simonds v. Wagner, 101 U. S. 261, 25 L. Ed. 910; U. S. v. Hughes, 11 How. 568, 13 L. Ed. 809; Wirth v. Branson, 98 U. S. 118, 25 L. Ed. 86; Deffeback v. Hawke, 115 U. S. 392, 6 Sup. Ct. 95, 29 L. Ed. 423; Colorado Coal & Iron Co. v. U. S., 123 U. S. 307, 8 Sup. Ct. 131, 31 L. Ed. 182; Davis' Adm'r v. Weibbold, 139 U. S. 524, 11 Sup. Ct. 628, 35 L. Ed. 238. In Re Jack, 7 Land Dec. Dep. Int. 570, and Rea v. Stephenson, 15 Land Dec. Dep. Int. 37, it was held that when a homesteader has completed his entry and made final proof, and final certificate has issued, a subsequent mineral discovery cannot affect his title, and a hearing regarding the same will not be ordered. In Reid v. Lavalle, 26 Land Dec. Dep. Int. 100, it was said by the secretary:

"The only questions properly before the land office in this proceeding are those which relate to the actual known character of the land in controversy at the date of cash entry No. 269. If the land was then known to be valuable chiefly for its mineral contents, it was not subject to such entry. * * * The defendant's representations could not relieve the land department of its duty to determine the actual known character of the land at the date of the cash entry. * * * If the land was not mineral in character when Lavelle made his cash entry therefor, and if he is shown to have possessed the necessary qualifications, and to have fully complied with the homestead laws up to that time, his entry must stand."

So in respect to school lands. Under the school-land grant from congress it has been many times held that, unless they contain known mineral at the date of the survey, title thereto passes to the state, and subsequent discovery of mineral in profitable quantities could not devest the state of its title. Saunders v. Mining Co., 125 Cal. 159, 57 Pac. 656; Ivanhoe Min. Co. v. Keystone Consol. Min. Co., 102 U. S. 175, 26 L. Ed. 126; In re Miner, 9 Land Dec. Dep. Int. 408; Barringer & A. Mines & M. 527. See, also, Shaw v. Kellogg, 170 U. S. 312, 18 Sup. Ct. 632, 42 L. Ed. 1052. And in respect to state lieu selections the law is settled that the rights of the parties claiming them are to be determined by the facts as known to exist at the date of the selection. McCreery v. Haskell, 119 U. S. 327, 7 Sup. Ct. 176, 30 L. Ed. 408; Howell v. Slauson, 83 Cal. 546, 23 Pac. 692; Milling Co. v. Morgan, 106 Cal. 416, 39 Pac. 802. In Wirth v. Branson, 98 U. S. 118, 25 L. Ed. 86, the supreme court declared:

"A party who has complied with all the terms and conditions which entitle him to a patent for a particular tract of land acquires a vested interest therein, and is to be regarded as the equitable owner thereof while his entry or location remains in full force and effect."

See, also, Whitney v. Morrow, 112 U. S. 695, 5 Sup. Ct. 333, 28 L. Ed. 871; Edwards v. Elliott, 21 Wall. 539, 22 L. Ed. 488; Cornelius v. Kessel, 128 U. S. 456, 9 Sup. Ct. 122, 32 L. Ed. 482, in which latter case the court said:

"The power of supervision possessed by the commissioner of the general land office over the acts of the register and receiver of the local land offices in the disposition of the public lands undoubtedly authorizes him to correct and annul entries of land allowed by them where the lands are not subject to entry, or the parties do not possess the qualifications required, or have previously entered all that the law permits. The exercise of this power is necessary to the due administration of the land department. If an investigation of the validity of such entries were required in the courts of law before they could be canceled, the necessary delays attending the examination would greatly impair, if not destroy, the efficiency of the department. But the power of supervision and correction is not an unlimited or an arbitrary power. It can be exerted only when the entry was made upon false testimony or without authority of law. It cannot be exercised so as to deprive any person of land lawfully entered and paid for. By such entry and payment the purchaser secures a vested interest in the property, and a right to a patent therefor, and can no more be deprived of it by order of the commissioner than he can be deprived by such order of any other legally acquired property. Any attempted deprivation in that way of such interest will be corrected whenever the matter is presented so that the judiciary can act upon it."

The decisions of the land department are to the same effect. See In re Abercrombie, 6 Land Dec. Dep. Int. 693; Harnish v. Wallace, 13 Land Dec. Dep. Int. 108; In re Miner, 9 Land Dec. Dep. Int. 408; In re Laney, Id. 83; In re Plymouth Lode, 12 Land Dec. Dep. Int. 513.

As has been said, the question that remains open to inquiry by the land department up to the issuance of patent is whether or not the selected land was vacant and open to settlement at the time of its selection. Vacant public lands are open to settlement under the laws relating to that subject when they contain no "known salines or mines" (Act Sept. 4, 1841; 5 Stat. 455; Rev. St. § 2258), whether of gold, silver, petroleum, or any other mineral. The law as to what constitutes a "known mine," under the statutes relating to the settlement of public lands, is also thoroughly well established. In the case of Deffeback v. Hawke, 115 U. S. 392, 6 Sup. Ct. 95, 29 L. Ed. 423, the legislation on the subject was reviewed at length. It was there held that no title from the United States to land known at the time of sale to be valuable for its minerals, of gold, silver, cinnabar, or copper, can be obtained under the pre-emption or homestead laws, or the town-site laws, or in any other way than as prescribed by the laws especially authorizing the sale of such lands, except in the states of Michigan. Wisconsin, Minnesota, Missouri, and Kansas. The court say (page 404, 115 U. S., page 100, 6 Sup. Ct., and page 426, 29 L. Ed.):

"We say 'land known at the time to be valuable for its minerals,' as there are vast tracts of public land in which minerals of different kinds are found, but not in such quantity as to justify expenditures in the effort to extract them. It is not to such lands that the term 'mineral,' in the sense of the statute, is applicable. * * * We also say lands 'known' at the time of their sale to be thus valuable, in order to avoid any possible conclusion against the validity of titles which may be issued for other kinds of land, in which, years afterwards, rich deposits of minerals may be discovered. It is quite possible that lands settled upon as suitable only for agricultural purposes, entered by the settler and patented by the government under the pre-emption laws, may be found, years after patent has been issued, to contain valuable minerals. Indeed, this has often happened. We therefore use the term 'known' to be valuable at the time of sale, to prevent any doubt being cast upon titles to lands afterwards found to be different in their mineral character from what was supposed when the entry of them was made and the patent issued."

103 F.—37

In the case of Colorado Coal & Iron Co. v. U. S., 123 U. S. 307, 8 Sup. Ct. 131, 31 L. Ed. 182, one of the grounds on which the government sought to annul the patents was that the lands there in controversy, which turned out to contain large and valuable deposits of coal, were not subject to settlement and sale under the pre-emption laws; being "known mines," within the meaning of those laws. The court held that it is not sufficient to constitute "known mines" of coal, within the meaning of the statute, that there should merely be indications of coal beds or coal fields of greater or less extent, and of greater or less value, as shown by outcroppings. Referring to the act of July 1, 1864 (13 Stat. 343), by which it was declared:

"That where any tracts embracing coal beds or coal fields constituting portions of the public domain, and which as 'mines' are excluded from the pre-emption act of 1841 (5 Stat. 455), and which under past legislation are not liable to ordinary private entry, it shall and may be lawful for the president to cause such tracts, in suitable legal subdivisions, to be offered at public sale to the highest bidder, after public notice of not less than three months, at a minimum price of twenty dollars per acre; and any lands not thus disposed of shall thereafter be liable to private entry at said minimum,"—the court said: "We hold, therefore, that to constitute the exemption contemplated by the pre-emption act, under the head of 'known mines,' there should be upon the land ascertained coal deposits of such an extent and value as to make the land more valuable to be worked as a coal mine under the conditions existing at the time than for merely agricultural purposes. The circumstance that there are surface indications of the existence of veins of coal does not constitute a mine. It does not even prove that the land will ever be, under any conditions, sufficiently valuable on account of its coal deposits to be worked as a mine. A change in the conditions occurring subsequently to the sale, whereby new discoveries are made, or by means whereof it may become profitable to work the veins as mines, cannot affect the title as it passed at the time of the sale. The question must be determined according to the facts in existence at the time of the sale. If upon the premises at that time there were not actual 'known mines' capable of being profitably worked for their product, so as to make the land more valuable for mining than for agriculture, a title to them acquired under the pre-emption act cannot be successfully assailed."

See, also, Davis' Adm'r v. Weibbold, 139 U. S. 524, 11 Sup. Ct. 628, 35 L. Ed. 238; Railroad Co. v. Valentine, 11 Land Dec. Dep. Int. 238.

Nor is it of any importance, in view of the provisions of the statute under consideration, that the selection here in question may have been made in the hope of finding oil in the land. The statute conferring the right of selection does not make that right in any way depend upon the intent with which it is made. Mining Co. v. Reynolds, 124 U. S. 374, 8 Sup. Ct. 598, 31 L. Ed. 466; Sullivan v. Mining Co., 143 U. S. 431, 12 Sup. Ct. 555, 36 L. Ed. 214. Should doubt exist as to the character of any of the public lands standing upon the books of the local land offices as open to settlement, to which no valid right has attached, it is undoubtedly within the power of the officers of the general land office to withdraw them from settlement or sale pending an inquiry as to their true character. And such action, it is understood, has recently been taken by the land department in respect to some of the public lands in California, whose surface indications and the character of adjacent lands tended to show that they are oil lands. Lands so withdrawn are, of course, not open to settlement, and there-

fore not subject to selection under the act of June 4, 1897, in lieu of any land relinquished to the United States. But they continue open to exploration for minerals, and, when mineral is found therein, to location under the mining laws, if the land be at the time unappropriated. And even where such discovery is made subsequent to a prior location, if the location be otherwise valid, that fact is held to be immaterial, provided always that no rights of others have intervened before compliance by the locator with all of the statutory requirements. Nevada-Sierra Oil Co. v. Home Oil Co., supra, and cases there cited.

The case as presented showing that the complainant has an equity in the land in controversy which may ripen into a perfect legal title, it is entitled to the interposition of a court of equity to protect that right as against trespassers who confessedly threaten to enter thereon and to despoil the property of its chief, if not its only, value. In the case of Railroad Co. v. Hussey, 15 U. S. App. 391, 9 C. C. A. 463, 61 Fed. 231, there was a grant to the railroad company by congress of certain alternate odd-numbered sections of public land, not mineral, to distinguish which from lands retained by the government a survey was essential; and in its absence the defendant, Hussey, without any right, entered within the grant limits and proceeded to cut down, destroy, and carry away a large amount of timber standing and growing upon what, when surveyed, would be odd-numbered sections, as well as what would, upon survey, prove to be even-numbered sections, of the lands within the grant limits. One of the contentions on the part of the railroad company in that case was that prior to the survey the railroad company and the government occupied the position of tenants in common of all of the lands situated within the grant limits. While denying the correctness of that position, the circuit court of appeals for this circuit said:

"But, because it cannot be properly held that the complainant and the United States are, prior to its survey, tenants in common of the entire body of lands within the limits of the grant to the railroad company, does it necessarily follow that a trespasser may with impunity go upon the lands and cut down and destroy or carry away the timber growing upon them? The bill shows that the lands in question are valuable only for the timber that grows upon them. To cut down, destroy, or carry away the timber thereon is therefore, essentially, to destroy and take away the very substance of the estate. That an injunction will be awarded, in behalf of one showing the necessary interest in the property, to prevent such waste and destruction, is thoroughly settled. Erhardt v. Boaro, 113 U. S. 537, 5 Sup. Ct. 565, 28 L. Ed. 1116. It is apparent that the complainant has no adequate remedy at law. It cannot maintain an action for damages for the cutting of any tree or trees upon the lands in question, or any other action at law, for the reason that it would be essential to the maintenance of such an action for the plaintiff to show that the particular tree or trees for the cutting of which damages were claimed, or other relief was asked, came from the land of the plaintiff; and this, as has been seen, is impossible to be shown in advance of the government survey. Yet the bill shows that the defendant, without any right or authority whatever,—in other words, as a mere trespasser,—has entered upon the body of unsurveyed lands within the limits of the grant to the complainant, and for purposes of speculation and sale has commenced to cut down the timber thereon, and to manufacture the same into saw logs, lumber, etc., and has so cut 850,000 feet of saw logs, and will, unless restrained, continue those illegal acts, and thus remove the very thing which constitutes the

chief, if not the only, value of the lands. Every tree already felled by the defendant, and every tree intended to be cut by him, in the prosecution of his undertaking, necessarily impairs the value of the complainant's interest in its grant; for the condition of the lands within the grant limits necessarily renders it uncertain and impossible to ascertain how many of such trees have been or will be cut from the lands belonging to the complainant. This very uncertainty would seem to vest in such grantees the right to protect the whole as against a mere trespasser and wrongdoer. .* * * The bill in the present case alleges that the acts complained of are committed by the defendant upon what, when surveyed, will be odd-numbered sections, as well as what will be even-numbered sections, of the lands within the grant limits. The case is a novel one, it must be admitted; but where so great a wrong is being perpetrated, as must be taken to be true for the purposes of the present decision, and the party seeking to prevent the wrong has no adequate remedy at law, equity, we think, will afford the remedy. 'Ubi jus, ibi remedium,' is the maxim which forms the root of all equitable decisions; and, responding to the objection that certain orders issued in the case of Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co. (C. C.) 54 Fed. 746, 751, were without precedent, the court said: 'Every just order or rule known to equity courts was born of some emergency, to meet some new conditions, and was therefore, in its time, without a precedent. If based on sound principles, and beneficent results follow their enforcement, affording necessary relief to the one party without imposing illegal burdens on the other, new remedies and unprecedented orders are not unwelcome aids to the chancellor to meet the constantly varying demands for equitable relief.' "

It results from what has been said that, until it shall be determined by the land department that the tract of land in controversy was not vacant and open to settlement at the time of its selection by the predecessor in interest of the complainant, an equity in that tract exists in the complainant, which a court of equity should protect against such acts as are here threatened and complained of. Accordingly a decree will be entered in favor of the complainant, with a provision, however, to the effect that should the land department of the government, at any time prior to the issuance of a patent for the selected tract, determine that the land was not vacant and open to settlement at the time of its selection, the operation of the decree shall thereupon cease.