UNITED STATES v. McCUTCHEN et al.

(District Court, S. D. California, N. D. July 29, 1916.)

No. A–12.

1. MINES AND MINERALS ⊜29(1)—OIL CLAIMS—RIGHT ACQUIRED BY LOCA-
TION.
Under the laws of the United States, one who locates an oil mining
claim on public land, though he erects appropriate monuments and posts
and records his location notices, if he makes no discovery of mineral,
acquires no rights as against the government or any private individual,
except the right to proceed with diligence to effect discovery of oil, and
even though in actual possession, in the absence of discovery, and in the
absence of diligent prosecution of work leading to discovery, as against
the government, at least, he is subject to the possibility of a withdrawal
of the privilege offered him and a consequent termination of his rights.
[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 66;
Dec. Dig. ⊜29(1).]

2. MINES AND MINERALS ⊜29(1)—OIL CLAIMS—RIGHTS ACQUIRED BY LOCA-
TION.
If in such case the locator leaves his claim without intending to aban-
don it, he may return at any time prior to the withdrawal of the land
from entry by the government, or its entry by another, and proceed to
prosecute with diligence his search for mineral, and while so engaged will
be protected, both from the government and from private persons, and if
his work is successful, and results in discovery, his right will vest by re-
lation as of the time of his location.
[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 66;
Dec. Dig. ⊜29(1).]

3. MINES AND MINERALS ⊜17(1)—OIL CLAIMS—"DISCOVERY."
Under Act Feb. 11, 1897, c. 216, 29 Stat. 526 (Comp. St. 1913, § 4635),
which provides that "any person authorized to enter lands under the
mining laws of the United States may enter and obtain patent to lands
containing petroleum or other mineral oils, and chiefly valuable therefor,
under the provisions of the laws relating to placer mineral claims," as-
suming a valid location, a subsequent discovery by the locator, which will
vest him with rights in the property, must be such as establishes its
character as within the act, and entitles him to a patent on compliance
with the other requirements of the statutes.
[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 24,
27, 28; Dec. Dig. ⊜17(1).
For other definitions, see Words and Phrases, First and Second Series,
Discovery.]

4. MINES AND MINERALS ⊜17(1)—OIL CLAIMS—"DISCOVERY."
The finding of gas in drilling a well on an oil claim in too small quan-
tity to be of any commercial value, or to give reasonable evidence of the
value of the land for oil, and which was not at the time given any
consideration as an inducement of further expenditures for development,
held not a "discovery," which gave the locator any vested rights in the
property as against the United States.
[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 24,
27, 28; Dec. Dig. ⊜17(1).]

5. MINES AND MINERALS ⊜29(4)—OIL CLAIMS—RECOVERY BY UNITED STATES
—DAMAGES.
On an account for damages in a suit in equity by the United States for
the recovery of oil land, defendants, who sunk and operated wells on
the land in good faith, under advice of reputable counsel, and where the

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

question of their rights under the law was in great doubt, will not be treated as willful trespassers.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 69, 70; Dec. Dig. ☞29(4).]

In Equity. Suit by the United States against G. W. McCutchen and others. Decree for complainant.

See, also, 234 Fed. 702.

This controversy centers about the right of the government of the United States, in furtherance of its declared conservation policy and because of its withdrawal orders heretofore issued, to assert its paramount proprietary interest in, and title to, a certain quarter section of very valuable oil land in the California oil fields. See U. S. v. Midwest Oil Co., 236 U. S. 459, 35 Sup. Ct. 309, 59 L. Ed. 641. The proceeding in one form or another has been pending for some time before the courts and the Land Department, and the principal facts necessary to a proper understanding of the issues to be determined have been stated in reported decisions heretofore rendered with considerable detail. In the proceeding before the Land Department, which was an application on the part of the Pacific Midway Oil Company, one of the operating defendants herein, for a mineral patent, the Commissioner of the General Land Office made a very full statement of the facts. 44 Land Dec. 420. Thereafter, in an application for a receiver, before Judge Dooling, of the Northern District of California, then sitting in this court under special assignment, a further statement was made. 217 Fed. 650. Subsequently a renewed application for receivership was entertained in this court, whereupon I made such additional statement of the facts as seemed to be necessary, and made an order appointing a receiver of the properties in question. 234 Fed. 702. For purposes of clarity merely, in connection with the conclusions announced herein, the controlling facts may be summarized as follows:

In January, 1900, the ground in question being then open, unoccupied, unappropriated public land of the United States, was located by certain defendants herein, named G. W. McCutchen, R. L. McCutchen, J. B. McCutchen, W. C. McCutchen, C. W. Johnson, Mrs. Lena McCutchen, Mrs. M. A. Johnson, and Mrs. M. P. McCutchen. For purposes of brevity, the various McCutchens will be referred to hereafter by their initials. G. W., R. L., J. B., and W. C. were brothers, and composed what will be hereafter referred to as "McCutchen Bros.," an informal association or partnership. Mrs. Lena McCutchen is the wife of R. L., Mrs. M. P. McCutchen is the wife of J. B., Mrs. M. A. Johnson is the sister of the McCutchen men, and C. W. Johnson is her husband. The location above referred to, which was named the Lone Star, consisted merely of the entry upon the ground of the persons named, the erection of appropriate monuments, together with the posting and subsequent filing of a notice of location as of mineral ground. No "discovery" was made. It may not be amiss to suggest at this time that it appears from a careful consideration of all the testimony, giving due weight to every circumstance presented, that the Lone Star location was made by the members of the McCutchen family, as above set forth, for the benefit of the entire McCutchen family, including, not only the eight locators, but probably some others not mentioned therein, and that at all times thereafter the members of the McCutchen family considered and understood, howsoever they may appear to have acted, that they, collectively, were entitled to enjoy the ownership of the Lone Star claim. In passing, it may also be suggested that the Johnsons, because of personal considerations unnecessary to specify here, were somewhat dependent upon the McCutchen brothers for maintenance and support.

In December, 1900, the locators of the Lone Star conveyed the same to R. L., with the intent and purpose in so doing that, because of the individual ownership, it might be the more easily handled and managed, but with no intention at all of investing R. L. with the sole title and beneficial interest in and to the property. Under a mistaken conception as to the requirements of, as well as the privileges conferred by, the mining law, so-called assessment work was done upon the claim for one or more years. In 1907, because of a

failure to do this assessment work the previous year, for the purpose of reinvesting the members of the McCutchen family with the title to the property, but under the misconception again as to a prohibition of the law forbidding locators, after failure to do assessment work, from relocating their own claims, the property was relocated under the name of the Cormorant claim by certain members of the Freear family, who were relatives of the McCutchens, and through whom it was expected that the title would be reinvested in the McCutchens. Late in 1908 the McCutchens began the erection of an oil rig upon the property. Some work was done that year also by an individual named Howe, who was doing so-called assessment work upon the property under a location of the property made the preceding year by one Francis, who entered and made the same sort of a location, apparently, as was made by the McCutchens in 1900, but who also, like them, had effected no discovery of mineral therein.

In 1909 one Smith, who was looking for available oil properties to exploit, entered into negotiations with G. W. McCutchen, representing the McCutchen interests, whereby, finally it was agreed that a corporation be organized by Smith and his associates, who should enter upon the land in question and drill the same for oil at least to a depth of 2,000 feet, if production were not had previously. In drafting the formal contract embodying this agreement, it was discovered that the so-called Freear location, under which the parties were then formally operating, did not contain a correct description of the land actually located, whereupon G. W. offered to, and did, go out and have the land relocated by eight acquaintances, who admittedly consented to the use of their names merely in order that G. W. McCutchen, or the McCutchen family, might secure the advantages consequent upon a valid relocation of the quarter section in controversy. This location was known as the Hawk location, and is the one which was made the basis for the application for a patent in the Land Department.

The corporation formed under the Smith contract was known as the Obispo Oil Company, one of the defendants herein, and it entered upon the property in question and, making use of the McCutchen rig thereon, proceeded to drill for oil. Two holes were sunk, each approximately 500 feet deep, but no oil was discovered in either one. On August 5, 1909, the Obispo Company being without financial resources, and apparently lacking the then means, or not harboring the disposition to secure additional financial resources, secured from the McCutchen brothers a consent to a 90-day cessation of their labors upon the property. Thereupon, apparently pursuant to a demand from the McCutchens in the cessation agreement to the effect that "some one [be] left in charge of and to protect the property," though all work ceased and all employés were discharged, a caretaker was left in possession of the property, whereupon the representatives of the Obispo Company started out to secure more funds, or to interest some one else in the performance of its contract. It was successful in the latter behalf, in that, in the spring of 1910 the Pacific Midway Oil Company, a defendant herein, entered into an agreement with the Obispo Company to complete the McCutchen contract. This it proceeded to do, and a new well was drilled, and oil actually encountered and produced by it on June 6, 1910. Thereafter, on June 27, 1910, the Mud Hen location was made upon the land; the locators being all members of the McCutchen family, G. W. and the Johnsons, however, not appearing therein.

The government by its bill of complaint alleges that it is entitled to the land; that none of the defendants have any valid claim or right thereto, or any part thereof, or to extract any minerals therefrom. It alleges that "the land now is, and at all times has been, oil and gas bearing land, containing rich deposits of petroleum, or mineral oil and gas, in commercially paying quantities, and at all times is and has been chiefly valuable for the petroleum or mineral oil deposited therein, and has never contained any minerals other than petroleum or mineral oil and gas." It asserts that without right, and in violation of its proprietary rights in the premises, divers of the defendants have entered upon the land, and have been and now are extracting the minerals therefrom, and committing waste therein. It alleges the making of the withdrawal order by President Taft on September 27, 1909, wherein this land,

together with other lands mentioned, was withdrawn from all forms of entry and exploration for minerals. It is alleged that the defendants have entered upon and are operating the property solely under the Hawk location, hereinabove referred to, and that such Hawk location was void because the locators thereof were obviously acting as mere dummies for others, and in this behalf it is alleged that the said Hawk location was made for the sole use and benefit of G. W. McCutchen, to enable him to secure a greater area of mineral ground than was allowable to him under the laws of the United States in a single location. It is further alleged that no petroleum or other mineral was produced in said land prior to June 6, 1910, on which date oil and gas were produced by the Pacific Midway Oil Company. It is also alleged that, at the date of the Taft withdrawal in 1909, none of the defendants or any other persons were on the land engaged in diligent prosecution of work leading to a discovery of oil. Whereupon, because of these facts, it is asked by the government that the defendants be required to set up whatever asserted rights they may have, that all such rights may be declared void, and that an appropriate judgment as for an accounting as for the extraction of oil may be granted, etc.

The answers of the defendants admit the mineral character of the land, deny the asserted want of diligence, allege the exercise of reasonable diligence at the time of the Taft withdrawal, and deny that the operations on the land were conducted under the Hawk location, but allege that at all times the operators thereon were conducting their mining operations and drilling under and with a view to the protection of the rights of the McCutchens under the Lone Star location. In amendments to the answers, filed just before the trial, it is also specifically alleged that a discovery of mineral, to wit, gas, was had on the land by the Obispo Company in May, 1909.

James C. McReynolds, Atty. Gen., E. J. Justice and A. I. McCormick, Sp. Asst. Attys. Gen., and Albert Schoonover, U. S. Atty., of Los Angeles, Cal., for the United States.

Beasly & Fry, of San Jose, Cal., for defendant Bean-Spray Pump Co.

Samuel Shortridge, of San Francisco, Cal., for defendants Spreckles Oil Co. and J. D. Spreckles.

A. L. Weil, of San Francisco, Cal., for defendants General Petroleum Co. and David S. Bachman.

J. W. Wiley, of Bakersfield, Cal., for defendants G. W. McCutchen et al.

R. T. Harding, of San Francisco, Cal., for defendants Pacific Mid. Oil Co., Pacific States Refiners' Co., and American Oriental Co.

M. S. Platz, of Bakersfield, Cal., for defendants Francis.

Curtis H. Lindley, of San Francisco, Cal., for defendant Obispo Oil Co.

George W. Lane, of San Francisco, Cal., for defendant Independent Oil Producers Co.

Andrews, Toland & Andrews, of Los Angeles, Cal., for defendants Union Oil Co., Maricopa Star Oil Co., Producers' Transp. Co., and Maricopa Oil Co.

Geo. E. Whitaker and Rowan Irwin, of Bakersfield, Cal., for defendant Coons.

Oscar Lawler, of Los Angeles, Cal., for defendant Midway Fields Oil Co.

BLEDSOE, District Judge (after stating the facts as above). [1, 2] Preliminarily, I feel constrained to suggest that I see no reason

to depart at all from either the reasons adopted or the conclusions reached heretofore in the hearing herein on the question of the appointment of a receiver. 234 Fed. 702. A consideration of the facts in the case, as they have been presented in detail on the trial, serves. but to confirm the conclusions, announced in that opinion, that defendants were not diligently engaged in the prosecution of work leading to a "discovery" on September 27, 1909, the date of the Taft withdrawal.

Under the laws of the United States, as the same have been enacted from time to time and as they have been construed by the courts, I think it may be safely asserted that one who enters upon the public domain and "locates" land as for its mineral content, as oil land, though he may erect appropriate monuments, and post and properly file location notices, *if he makes no "discovery" of mineral,* acquires no rights of any nature against the government or any private individual, save the right to proceed with diligence to effect an actual discovery of mineral, gas, or oil. He may remain out of possession of the land, and, sitting supinely down, do nothing, awaiting developments of himself or of others on adjoining or in regional parcels, with no risk other than that of being dispossessed by the government or by some other locator. If, however, luck and chance are with him, he may return at some considerable period thereafter—at any time, in fact, prior to actual withdrawal by. the government or entry by another—and proceed to prosecute with diligence his search for mineral. If he so returns, during the time he may be in possession actually engaged in the diligent prosecution of work leading to a discovery, he will be protected from inroads upon his rights, asserted either by the government or by private parties, and when he does, if ever, actually effect a discovery of mineral, his vested right to the possession and enjoyment of the property and of its mineral contents may, with no impropriety, I think, in so far as may be necessary to secure protection to his rights, be said to relate back to the time of his original location, and will continue in the future for such time as he may comply with all valid laws and mining regulations. He is then for the first time in the position of one who, having made a discovery of mineral upon vacant, unappropriated public land, has perfected a "location" thereof in the strict sense of that term, and is thereafter subject to all the obligations and possessed of all the privileges of one in possession of a valid and subsisting mining claim. In other words, possession and enjoyment of mining ground in the United States depend upon location and discovery of valuable minerals therein.

With respect to oil land, at least, arising out of the necessities of the case, discovery may, if not must, follow location. Upon discovery, however, whenever attained, in the absence of intervening rights of a superior nature, the same rights and results flow as if discovery had preceded location, and, pending discovery, the locator, after location, possesses all of the substantial rights consequent upon a discovery itself, as long as he continuously engages himself with diligence in seeking for oil upon the claim. But in the absence of a discovery, and in the absence of diligent prosecution of work leading to a discovery, even though in actual possession of the property, as against the government, at least, he is subject at any time to the possibility of a withdrawal of

the privileges offered to him and consequent termination of his rights. His status is in the nature of a tenancy at sufferance. Mining Co. v. Tunnel Co., 196 U. S. 337, 25 Sup. Ct. 266, 49 L. Ed. 501; Cosmos Exploration Co. v. Gray Eagle Oil Co., 112 Fed. 4, 50 C. C. A. 79, 61 L. R. A. 230; McLemore v. Express Oil Co., 158 Cal. 559, 112 Pac. 59, 139 Am. St. Rep. 147; Hirshfeld v. Chrisman, 40 L. D. 112; Miller v. Chrisman, 140 Cal. 440, 73 Pac. 1083, 74 Pac. 444, 98 Am. St. Rep. 63; Chrisman v. Miller, 197 U. S. 313, 25 Sup. Ct. 468, 49 L. Ed. 770; Borgwardt v. McKittrick Oil Co., 164 Cal. 650, 130 Pac. 417; Smith v. Union Oil Co., 166 Cal. 217, 135 Pac. 966; Tuolumne Consolidated Mining Co. v. Maier, 134 Cal. 583, 66 Pac. 863; Olive Land & Development Co. v. Olmstead (C. C.) 103 Fed. 568; New England Oil Co. v. Congdon, 152 Cal. 211, 92 Pac. 180; U. S. v. Midwest Oil Co., 236 U. S. 459, 35 Sup. Ct. 309, 59 L. Ed. 641; In re Lowell, 40 Land Dec. 303; U. S. v. McCutchen (D. C.) 234 Fed. 702.

Reasoning from these premises, *in the absence of an entry, location, and discovery, or the diligent doing of work looking to a discovery, by adverse interests,* and in the absence of any evidence of an intention to abandon the original location, what may have happened, as shown by the evidence herein, as to the doing or not doing of assessment work, the making of adverse locations, or the making or attempted making of relocations, all become of no consequence. If the Lone Star location of 1900 was originally valid, and not void because in fraud of the government's general mineral land policy, and if in May, 1909, a valid discovery of mineral was made upon the land by the Lone Star locators, or their agents or assignees, then, no intervening location rendered valid by prosecution of diligent work or discovery having been made, the discovery in May, 1909, would confer upon the Lone Star locators, or their assignees, the vested status of true "locators" of mineral land. If they possessed that status in May, 1909, and thereafter conformed to and complied with the law, no act by the government short of proceedings in eminent domain could serve to deprive them of such right of property. They could not, in the very nature of things, be subjected to the provisions of any subsequent withdrawal order, of whatever source or authority.

A determination of the basic and controlling features of this case, then, depends upon an answer to the two questions: Was the Lone Star location valid, and devoid of fraudulent intent? If so, did its beneficiaries actually through the efforts of themselves or their agents, effect a "discovery" of oil or gas thereon prior to September 27, 1909?

With respect to the first question, I can come to no conclusion other than that it should receive an affirmative answer. As indicated hereinabove, the Lone Star location was probably made for the purpose of benefiting, not only the eight members of the McCutchen family named therein as locators, but also others who were more or less dependent upon the McCutchen brothers. The management and control of the Lone Star claim, assuming that, in the absence of a discovery, the word "claim" could be applied to the inchoate right possessed, was vested either in R. L. or G. W., or in the informal association known as the McCutchen Bros., and composed of the four active members of the family.

It was also managed and controlled, apparently, for all of the McCutchen family. The arrangements had to effectuate this, together with the ultimate purpose in view, seem to have been of a commendable nature and tendency. With respect to the property, some members of the McCutchen family were doing work; some were not. Some were assuming responsibilities; some were not. All, however, apparently, were sharing, and were expecting to share to a greater or lesser extent, in the proceeds from the property. It may be that there was the fraudulent intent that an individual, or, what is more colorable, that the "McCutchen Bros.," should be the sole and real beneficiary of the Lone Star location; but there is no proof that this was the fact, and no circumstances adduced from which the court could rationally, and in the exercise of the reasonable discretion confided to it, deduce the inference that such fraudulent intent in fact existed. The facts adduced are all consistent with honesty of purpose as well as with fraudulent design. In the absence of controlling proof of a contrary intent, the court is in duty bound to assume that the parties have been actuated, therefore, by honesty of purpose rather than by fraudulent intent.

The only elements which may be said to squint at fraud are the meagerness of the payments out of the proceeds from the oil developments to the Johnsons, and the relocation of the Mud Hen claim without the Johnsons being located therein. As to the first, however, it does appear that the Johnsons did share to a substantial extent in the proceeds from the sale and development of the property. If the location was originally valid, and made with no fraudulent intent to evade the mining laws, forbidding one employing the convenient device of making use of dummies in acquiring title to more mineral land than the laws would give him in one location, the property might thereafter have been divided up as the parties saw fit, and it might well have been the case that those who submitted to the larger labors and larger responsibilities were, by common consent, to enjoy the larger reward. The fact, also, that the Johnsons have not as yet received all of their share of the returns which may be coming to them, is not in itself conclusive of fraud. It may be, for reasons which were explained, and which, being of a private nature, are unnecessary to reiterate here, that it was the part of wisdom to withhold from the Johnsons a portion of the proceeds otherwise properly payable to them. In the absence of persuasive evidence to the contrary, and indulging in the presumption of good faith and of innocence of wrongdoing, I cannot but conclude that the situation is as claimed by those who are most familiar with its details.

The failure to include the Johnsons in the Mud Hen location at first appealed to me as a very suspicious circumstance; but it is made clear that this location was insisted upon by an attorney for one of the operating companies after the discovery of oil on the 6th of June, 1910, and to perfect, as he advised, what might be otherwise an invalid location. In the doing of this the McCutchens merely followed his advice and obeyed his directions. No fraudulent purpose can therefore be imputed to them because of this. The Hawk location, made in 1909, and upon which application for patent was based, obviously was open to suspicion of the severest sort, and it is no wonder that, under the rights

sought to be founded upon it, governmental agents concluded that a fraud was about to be perpetrated upon the government; but, as seen, however colorable the transaction, standing by itself, there was no fraudulent intent, even as to this location.

In substance, the parties directly interested, the McCutchens, were at all times relying upon and proceeding from an entirely valid and bona fide transaction and muniment of title, to wit, the Lone Star location of 1900. Their rights, therefore, and the rights of those deriving title from them, will have to be measured under the assumption that at all times within the domain of this controversy they had made and were relying upon a bona fide location of the mining ground in dispute.

The other fundamental question involved in the case, confessedly, is of much greater difficulty of answer. In arriving at the conclusion to which I have, after most careful and painstaking deliberation, been driven, I have been duly and sensibly impressed with the exceeding importance of this litigation to the various defendants involved herein. I have not underestimated the magnitude of their expenditures in the development of the quarter section in controversy, amounting approximately to $1,000,000, nor the value of the property itself, which has been estimated at more than $10,000,000, nor have I at any time been disposed, for any cause, to overlook the fundamental and basic rights inuring to them, in common with all citizens, that no change in, or modification of, any governmental policy, could through any species of judicial legerdemain, or administrative fiat, or otherwise, suffice to deprive them of any rights of property. Under our scheme of government, and as a condition precedent to its perpetuation, the property of the citizen must be as sacred from confiscation by the government as it is from appropriation by another. I have not permitted my individual approval of commendable conservation policies, therefore, to lead me to lose sight of the fundamental fact in this controversy that private rights of a vested nature are not susceptible to judicial destruction herein. Neither have I overlooked the fact that this proceeding has pendency in a court of equity. In so far as *equitable considerations,* proceeding from the conscience of the chancellor, and operating upon the conscience of the parties, have to do with this case, the court purposes to do only that which is equity, and which is in line with the court's most profound conceptions of high moral dealings.

The question in the case, reduced to its lowest terms, is: Had the defendants done anything, pursuant to the requirements of the law, whereby they had served to divest the government of its proprietary title to the land in question (i. e., served to clothe themselves with a *vested* right therein) previous to the withdrawal order of September 27, 1909? . If they had, they are entitled as of right to go their way and continue to exploit and operate the property as for their own individual and private benefit. If they had not, because of the withdrawal order, framed in furtherance of the conservation policy of the government, they are not entitled, as a matter of law, to continue to operate the property, and extract from it, for their own behoof, that which the government, from considerations of necessity, has determined to conserve. This question is essentially one of pure law, in

the consideration of which the court cannot be restrained by sympathy nor moved by principles of purely equitable cognizance. As to what shall be done otherwise concerning the respective demands and defenses of the litigants herein, if their consideration becomes necessary, is a matter for equitable consideration and for equitable adjustment. Then and therein the conscience of the chancellor will feel in duty bound to assert its high prerogative.

If the defendants had divested the government of the title to this property at the time of the withdrawal order (i. e., if they had acquired some vested rights therein), it must have been in virtue of some contractual relation. No conveyance has ever passed from the government, and consequently any rights inuring to the defendants must have arisen otherwise. There must have been something offered by the government, and something done by the defendants amounting to an acceptance of that offer. If the offer made by the government was accepted before being withdrawn, it cannot now, and could not at any time subsequent to such acceptance, be withdrawn. It thereby became a binding, enforceable obligation. If, however, it was withdrawn prior to acceptance, it stands precisely, on this phase of the case, as I see it, as if no offer had ever been made, and the parties are to be judged accordingly.

[3] Whatever may have been done with respect to mineral lands generally, lode or placer, the attitude of the government, with respect to its oil lands, was defined, as it was circumscribed, by its announced policy, as indicated by the adoption of the act of Congress of February 11, 1897. 29 Stat. 526. Therein it was enacted:

"That any person authorized to enter lands under the mining laws of the United States may enter and obtain patent to lands containing petroleum or other mineral oils, and chiefly valuable therefor, under the provisions of the laws relating to placer mineral claims."

It seems clear to me that Congress thereby intentionally limited the right of entry upon, and location of, oil lands to such lands as were "chiefly valuable therefor"—i. e., lands chiefly valuable for oil. Obviously, the government, as sovereign proprietor, could say what lands, if any, might be entered and located as for petroleum. It could, if it saw fit, deny the right to enter upon any such lands, and for the same reason could limit the lands upon which entry might lawfully be made. In this view of the situation, as to any lands not within the category specified in the statute, there was no invitation or authorization given to enter them, and in consequence no right could be obtained, as against the government, by so doing. In this connection, although attention will be directed to it more in detail hereafter, the difference in language between the act of February 11, 1897, and section 2319 of the Revised Statutes (Comp. St. 1913, § 4614), ought not to be overlooked. It seems to be not without significance. The act of 1897 gives the right to enter on "lands" which are "chiefly valuable" for oil. Section 2319 of the Revised Statutes, which has to do with the general right of the citizen to exploit the public mineral lands, recites that "all valuable mineral *deposits*" are declared open to exploration and purchase, and the lands in which they are found to occupation and

purchase," etc. (Italics mine.) In other words, as I sense the difference between the two statutes, as to lodes and placers the right is given to explore and purchase "valuable mineral deposits" and "the lands in which they are found"; but with respect to petroleum the right is given only to enter and obtain patent to lands which not only contain petroleum, but which are "chiefly valuable therefor." In a word, in one case the value of the "deposits" is the criterion, and in the other it is the value of the land. I believe this should not be lost sight of in defining what will suffice for a "discovery" under the oil statute.

It is hornbook law, of course, that the successful location or appropriation of mineral lands of any sort, to be valid, must be accompanied by a "discovery." This discovery, in its broad and comprehensive sense, is the doing or the accomplishing of that thing, with respect to the land sought to be appropriated, which serves to impress upon it the quality of being land which is open to appropriation or exploration, in the manner and pursuant to the law, sought to be made use of. And it may be said that, with becoming propriety, both judicial and departmental rulings have evinced a disposition to be liberal toward locators in the matter of the requirement as to what will suffice to constitute such a "discovery" as to segregate the land sought to be selected from the public domain, and invest it with the attribute of mineral land, and subject to private ownership or exploitation. What discovery, then, will suffice to meet the requirements under the act of 1897? Though under that act entry and patent were to be obtained pursuant to the placer mineral laws, yet it must be remembered that upon location and "discovery," followed or accompanied by the expenditure of $500, and upon application, patent from the government was to follow. R. S. § 2325 (Comp. St. 1913, § 4622). In this behalf I can see no escape from the conclusion that, as against the government, if the defendants had made such a location of, and "discovery" upon, the land in question, as to invest them with a right of property therein, they had made such location and "discovery" as to entitle them, as a matter of law and of right, to a patent. Conversely, if they had made no such "discovery" as to entitle them to a patent as against the government, they had made no such "discovery" as to vest them with rights in and to the property. McLemore v. Express Oil Co., 158 Cal. 559, 563, 112 Pac. 59, 139 Am. St. Rep. 147. (This question is wholly unrelated, of course, to that of continuing diligence heretofore referred to.)

[4] Defendants rely upon a "discovery of gas" in Obispo wells Nos. 1 and 2 in the spring and summer of 1909. Viewed in the most favorable light, I cannot but regard this asserted discovery as being of such an unsubstantial and negligible character, and as considered by the defendants at all times, until after this suit was brought, as of such unimportance, that I cannot bring myself to believe that it suffices to attach to the land in question the character of being "chiefly valuable" as for petroleum, or even gas, or that it should be considered as the equivalent of a "discovery" under the placer mining law. In this connection I feel it not inappropriate to suggest that, owing to the gravity

and importance of the questions herein presented, I have, with almost laborious effort, read and studied, not only all of the various decisions which the industry of learned and assiduous counsel has provided for me, but also others, not found, or at least not cited, by them, which seemingly have had to do with the question of the rationale of the rule respecting the sufficiency of a mineral discovery. In addition, I have given careful, and what I conceive to be painstaking, consideration to the testimony of the witnesses who have given evidence herein upon this subject, the transcript of which has been available to me. In order that this decision may not grow to interminable lengths, I shall content myself merely with a reference to some very brief statements of what I conceive to be the essentials, both with respect to the facts as developed, and the law as applicable.

Briefly, it may be said that in each of the two wells above referred to, when at a depth of 450 feet, and thereafter, some sort of vapor was observed coming from the wells. The contention indulged in by the government that defendants have failed to prove either that any gas actually did come from the wells, or that, assuming that it came, it was petroleum gas, are laid out of consideration. Under the evidence, no conclusion is possible, other than that some petroleum gas was produced from each of these two wells. As to the quantity of gas produced, I am forced to the conclusion, from a careful consideration of all the evidence, that it was extremely negligible. Respecting its volume (quantity), Judge Lindley, one of counsel for the defendants, says in his brief that:

"It was never accurately determined. There was at the time no particular attention paid to it for the purpose of determining its volume."

One witness states that it appeared like heat waves rising from the horizon on a hot day. Another smelt it, and several offered testimony that on at least one occasion it was lighted and flared up to a height of a couple of feet. Another witness at first stated that he observed it coming up through the water in the well in the form of bubbles, but later withdrew that statement. Obviously, however, if it came up at all, it must have come in some such fashion. Another witness, the man in charge of the Obispo operations during the time in question, but whose evidence as a whole, especially as demonstrated by his disposition to evade direct answers to material questions, does not impress me with its verity, testified that sufficient gas came out of each of the wells to furnish a 40-horse power boiler with fuel. There was other evidence that subsequently, in 1910 and 1911, when one of these wells was being continuously operated for its water content, and it became necessary to "pull out the tubing," in the process of doing so the gas would be noticed. There is a dearth of testimony, however, as to a constant, or substantially constant, emission of gas from the time of its original encounter down to the time of the trial, and, on the contrary, there is testimony offered by government witnesses, who had made careful examination of the wells in 1910 and 1911, and even as late as 1915, to the effect that at those times they failed to notice any gas in or about either of the wells.

In addition, there is another bit of evidence, not inconsequential in its nature, as weighing upon the apparent unimportance of the discovery claimed, that during the time subsequent to the cessation of work by the Obispo Company, and while the Pacific Midway Company was engaged in sinking its wells, a driller on the Midway Northern well, situated about a quarter of a mile away from the Obispo wells, though he was about the wells frequently and examined them, not only stated that he saw no gas coming from the wells at that time, but says further that he "never heard of gas at that time being in that well." A mining engineer named Jackson, who went on the ground as the representative of the Pacific Midway, at the time it took over the Obispo contract in 1910, gave evidence in the hearing before the Land Department that, for the purpose of making an investigation for his company, he not only sounded both of the Obispo wells, but also endeavored to continue the drilling in well No. 2, using all means available to him for that purpose, but in a detailed statement of conditions as he found them he nowhere makes even a casual mention of gas. True, he was not asked at that time, specifically, with reference to gas in the wells; but it appeals to me as a very strong and persuasive circumstance with respect to the inconsequential nature of this gas find that the engineer of a company which was then purposing to exploit the property should have made no mention at all, and therefore probably made no observation, of such a circumstance as it is now claimed sufficed to demonstrate that the property was oil land and "chiefly valuable therefor," and was of such a character as to justify a reasonably prudent man in making expenditures of money and time in its further exploration or exploitation. If there had been anything in the situation last above adverted to, I am constrained to feel that the engineer would have noticed it, and, if he had noticed it, he would have made some reference to it.

In this connection, also, a statement of Judge Lindley, made at the inception of the trial herein, and when application was made for leave to amend the answers, so as to allege a discovery of gas on the property prior to the withdrawal order, is not without force. He said that the original answers in this case "admit that there was no discovery either of oil or gas until after the withdrawal order in 1909." This is evidentiary only to the point that even as late as the filing of the original answers in this case, and with respect to the knowledge then possessed by those who were charged with the responsibility of defending the case, either as individuals or as officers of corporations, there was either no knowledge, or at least no attention paid to the fact, that gas had been encountered in the wells of the Obispo Company, previous to the withdrawal order, in such quantity, or under such circumstances, as to constitute a "discovery."

Another circumstance that is not without its effect upon me in this connection is that the leg of one of the wells nearest to the property in question, being that of the Midway Northern No. 1, and, as heretofore stated, located about a quarter of a mile away from the Obispo wells, was introduced in evidence. It was copied in the record, apparently, upon the precise blanks made use of by the drillers during

the course of their operations. It shows that the well was sunk to a depth of 1,920 feet, at which time oil was encountered; but, though the blank for record shows each day a place whereat to indicate the depth where "got gas," there is no entry on the report, at any depth, as to a discovery of gas. This is suggestive of the fact, either that no gas was in truth discovered previous to the discovery of oil, or, what is more probable, that it was considered of such little moment or importance as that no mention need be made of it. Assuming the latter to be the true situation, it affords something of a practical demonstration that drillers then working in this territory, presumably both practical and reasonable men, considered a finding of an apparently inconsequential volume of gas at a depth of 1,000 feet above the oil sand as being unimportant in nature, and probably not such a discovery of mineral, as *in itself* would justify a prudent man in going deeper and making greater expenditures of time and money. It is thus seen that no more than what might be termed mere casual attention was paid to the gas encountered in the Obispo wells, and that no rights were predicated upon it, or sought to be predicated upon it, until after a determination by this court that defendants were in default with respect to the proprietary rights of the government under the withdrawal order, because of their nonconformity to the rule requiring diligence of them in their search for mineral.

That the alleged discovery of gas was not pleaded in the case sooner is, in my judgment, a matter of no consequence in itself. If there was a valid "discovery," as the same is defined under the law, and that "discovery" had actually been relied upon as such, the mere fact that it was not presented earlier in this action as a defense to the claims of the government would, of course, be of no moment. That it never, however, was relied upon in any sense as constituting a "discovery," or as an inducement or justification for any of the defendants to make or continue to make expenditures upon the property in search of oil, is amply demonstrated by the evidence. The witness Burns, who was sent upon the property in August, 1909, with instructions to take such steps respecting future operations as seemed best, asserts that he reported to the stockholders, in session on September 15, 1909, with respect to the discovery of gas and his encouraging conclusions as a result thereof. But neither the stockholders nor the corporation, apparently, took any step because of such representation, or even determined because of it, to continue their operations upon the property. It nowhere appears from the evidence, in so far as I can ascertain, that the question of the discovery of gas was ever presented to, or in any wise considered by, any of those who had to do with operations upon this quarter section. None of the defendants seem to have been induced to expend their money because of, or in reliance upon, the alleged discovery of gas in the two abandoned Obispo wells. It may be said, then, that none of the defendants paid any attention at all to the gas encountered in 1909, either as an inducement to further progress, or as justification or cause for the expenditure of money upon their part, or as the basis of a valid "discovery."

To my mind the encountering of gas in a well under the circum--

stances detailed herein, and not giving it any consideration as a "discovery," possesses the same legal effect, and presents the same question, as if the gas had been in the well, and had been emitted therefrom, but the operators or owners had not seen it at all. If it were in the well, and actually produced, but not seen, no different situation would arise than if it were contained in the ground, but not penetrated at all by the well. All of which leads to the logical conclusion that if one locates—that is, marks out and "notices"—land which at the time actually contains oil or gas hidden within its depths, a subsequent demonstration of that fact thereafter, by anybody, would give such locator a valid location of the land as oil land. If one could locate land, and in boring for oil encounter gas, and give it no consideration at all as constituting a "discovery," he could, it seems to me, just as rationally and as logically go through the other performance mentioned; that is, not meet it at all, but claim it as a "discovery" when it suited his convenience or purpose so to do, merely because it was in the ground. This, I am constrained to hold, cannot be done, and that a locator may not rely upon the mere presence of mineral in the soil as a basis for a title to, or valid claim of, mineral land, unless, not only having encountered it, he has also, in good faith, when called upon to act, either based a "discovery" thereon, or been induced to expend his money because of its revealed presence.

The testimony of experts and practical oil men that the gas encountered by defendants was sufficient to justify them in further expenditures in search of petroleum becomes an immaterial factor, since it appears with indubitable clearness that the defendants were in no wise induced by anything they saw or found, in connection with the gas, to rely upon it, either as justification, cause, or excuse. On the contrary, in spite of their knowledge of it, as appears from the testimony of the witness Burns, the Obispo people, when they were called upon to act, refrained from proceeding with the due diligence which the law required, but seek now to take advantage of it as a mere afterthought, solely because it was there. Their disregard of it at all times when called upon to act, and their failure to rely upon it, in good faith, as an inducement to further progress upon their part, deprive them now of the right to set it up as a "discovery," as an acceptance of the government's offer, or as a sufficient justification for what they did. They, as well as their codefendants, did nothing because of it. Obviously, so far as the proofs show, they all would have done precisely what they did do if they had never encountered it, and consequently, in my judgment, they should not now be held to have acquired rights from a circumstance of such slight consequence, in the first place, and so utterly negligible in so far as influence upon their conduct is concerned, in the second.

The well-known litigation between Miller and Chrisman ultimately found its way into the Supreme Court of the United States. 197 U. S. 313, 25 Sup. Ct. 468, 49 L. Ed. 770. That tribunal, in affirming the judgment of the courts of California, had occasion to express itself with reference to what constitutes a sufficient discovery under the act of 1897. If I mistake not, it is the only case in which the

highest tribunal in the land has announced its conclusion with respect
to this particular matter.    Preliminarily, it should be observed that
the "discovery" therein relied upon was in fact *a discovery of min-
eral,* to wit, petroleum.    That only a small amount, such as would run
from a spring, float over the water, and drip down over a "rock
about two feet high,"· was the quantity discovered, is true; but the
fact to which I desire to draw particular attention is that *oil itself
was actually discovered.*    This, I think, serves to give added point
also to the conclusions of the Supreme Court.    After adverting to the
language of the act of 1897, providing that lands "chiefly valuable"
for oil could be located, the court says of the above-mentioned Bar-
rieau discovery:

> "It does not establish a discovery.  It only suggests a possibility of mineral
> of sufficient amount and value to justify further exploration."

And this it must be remembered is with respect to a discovery in-
volving the finding of petroleum itself.    The court thereafter quotes
from previous decisions with respect to the requirements, in so far
as the value of the mineral found is concerned, to justify the appel-
lation "discovery," and after quoting the rule announced in Castle v.
Womble, 19 Land Dec. 455, 457, proceeds to say:

> "Some cases have held that a mere willingness on the part of the locator
> to further expend his labor and means was a fair criterion.  In respect to this
> Lindley on Mines (1st Ed.) p. 336, says: 'But it would seem that the question
> should not be left to the arbitrary will of the locator.  Willingness, unless evi-
> denced by actual exploitation, would be a mere mental state, which could not
> be satisfactorily proved.  The facts which are within the observation of the
> discoverer, *and which induce him to locate,* should be such as would justify
> a man of ordinary prudence, not necessarily a skilled miner, in the expendi-
> ture of his time and money, in the development of the property.'"    (Italics
> mine.)

In this the Supreme Court apparently lends countenance to the
claim, advanced by the defendants herein, that the mere willingness
on the part of the locator to make additional expenditures is not the
test whereby the sufficiency of a "discovery" is to be determined.
But it must be understood that the question there was, not whether
his willingness should be one of the factors which enters into a con-
sideration of the case, but whether his willingness alone, which might
have been based, of course, upon overenthusiastic hopes and entirely
unreasonable ideas, could suffice to impress the land with the quality
necessary to validate an asserted right of appropriation.    The court,
however, quoting from Judge Lindley himself, does show, as I read
the language, that the facts upon which the locator may successfully ·
predicate a valid discovery must be such as, being within his obser-
vation, "induced him to locate."    In other words, though it is ob-
viously true, as contended by defendants, that willingness alone is
not the test of justification, it must be equally true that there can be
no justification in the absence of a willingness to rely, and an actual
reliance, upon the observed conditions.    The court then, adverting to
the liberality of the rule as between adverse claimants to mineral
land, with respect to what will constitute a "discovery," and after

conceding that that was the case then before the court, proceeds to hold that:

"Even in such a case  *  *  *  there must be such a discovery of mineral as gives reasonable evidence of the fact  *  *  *  if it be claimed as placer ground, *that it is valuable for such mining.*" (Italics mine.)

Adopting the conclusion thus announced, there is nothing in the case at bar tending to show that the quantity of gas actually encountered had at the time of its discovery, or at any period up to the time of this trial, any appreciable commercial value, or that its presence in the land, in the quantity in which it was found, served to impress upon the land any value at all. In the absence of such showing, in the face of this decision, I do not see how defendants' contentions can be accepted.

In Cook v. Johnson, 3 Alaska, 506, 534, et seq., the district court, in considering the sufficiency of a discovery under the placer law, calls attention to this holding of the Supreme Court in Miller v. Chrisman, and indulges in the observation, which is very persuasive with me, that the court used the language employed there as indicative of an intention to lay down a somewhat different rule with respect to the sufficiency of a discovery under the petroleum act, as differentiated from one under the general mining law. That difference, suggests the court, rests primarily upon the language of the act, that oil land may only be appropriated when it is "chiefly valuable" for its oil content. In the same case, at pages 528, 536 and 538, the court deals with the necessity of a reliance, in good faith, by the locator, upon the minerals actually observed by him, in order that a valid discovery may thereby be effectuated. On page 538, the court says:

"But to what extent is his [the locator's] bona fides to be considered in determining the sufficiency of his discovery and the matter of justification? *An examination of the books makes it evident that the bona fides of the locator is vital to the validity of his claim.* (Italics mine.) Thus, in the case just cited ([Book v. Justice Min. Co. (C. C.)] 58 Fed. 125), stress is laid on the fact that the discovery in good faith induced the prospector to locate and expend large sums for the purpose of properly working or developing the ground and complying with the provisions of the law."

After citing some other cases in point, the court continues:

"So that, after all is said and done, the attitude of the discoverer himself toward the sufficiency of his discovery is a potent factor in the determination of the question as to justification. Obviously these requirements are made to prevent locations based upon fictitious discoveries and attempts by means of fraud to obtain title to public domain for purposes of speculation. Do the acts of defendants' predecessor square with the question of good faith?"

On page 536 the court also calls attention to the fact, which is of moment herein, that, though subsequent developments had demonstrated that the claim in question was immensely rich, yet, *as this fact was obviously unknown to the locator at the time he made his alleged discovery,* it is held that he must be bound by what he knew at the time of his claimed location and "which induced him to locate." This answers the contention, raised by defendants, that because the government alleges the land in question to be valuable for its oil and gas con-

tent, that thereby the rights of defendants with respect to the sufficiency of its asserted "discovery" are affirmatively determined.

With the reasoning as well as the conclusion of the court in Cook v. Johnson I concur, and though they concerned a placer location, per se, I cannot conceive why they are not applicable in all their intensity and force to an oil location. Although the rule of diligence followed in oil locations apparently does not obtain in the Alaskan placers, it nevertheless is the fact in Cook v. Johnson that the asserted "discovery" upon which reliance was had, and the good faith of which the court held must be indubitably determined, occurred many months after the original location had been made.

The Land Department, in the Butte Oil Company's Case, 40 Land Dec. 602, after referring to some of the cases mentioned hereafter, held that no discovery had been made upon either of two claims involved. The facts were, briefly, that upon one claim in question the locator had drilled a well to a depth of 1,400 feet, but had struck no oil. A small flow of natural gas, however, was developed, insufficient for commercial purposes, and without value. One witness testified that by conserving the flow and using small pipes the gas might be sufficient for a range used by a resident in the near vicinity. Upon the other claim, there was a seepage of oil beneath a large rock upon the surface of a spring of water, which had stained some of the surrounding rocks. It could be skimmed off the surface and collected in a bottle, and one sample so collected upon analysis was proved to be petroleum. There is a striking similarity, in all of the substantial features of the situation, between the discovery upon the claim first mentioned and the discovery in the case at bar. There is also striking similarity between the discovery on the second claim and the Barrieau discovery, considered by the Supreme Court. With respect to both of these discoveries, however, the Department, upon consideration, held (page 606) that:

"The slight flow of gas and the small seepage of oil were indications that there possibly is a reservoir of oil lying at an unknown depth and situated at some unknown distance from the land, and cannot be regarded as a discovery of oil as a basis of a placer mining location under the act of February 11, 1897."

In Olive Land & Development Company v. Olmstead (C. C.) 103 Fed. 568, Judge Ross, of this circuit, held that the presence of physical features upon a location, to wit, the geological formation, the presence of an anticline and of bituminous sand which gave out a distinct odor of petroleum, and all of which, it was asserted, "would lead any experienced petroleum expert, or any practical geologist familiar with petroleum-bearing lands in California, to pronounce the same oil or petroleum territory and chiefly valuable therefor," and which would also "justify any prudent petroleum miner in locating the same as petroleum land, and in spending his time and money in developing the same for its petroleum product," did not suffice to validate an attempted location.

In Southwestern Oil Company v. A. & P. Railroad Company, 39 Land Dec. 35, the Land Department held, as phrased in the syllabus:

"The disclosure of a stratum of bituminous sandstone or shale from which a small quantity of oil seeps, not sufficient to impress the land with any value for mining purposes, does not constitute a sufficient discovery to support a valid mining location."

In Book v. Justice (C. C.) 58 Fed. 106, 125, Judge Hawley, of this circuit, in a decision which has become a classic in the literature of mining law, calls attention to the element of good faith, and the reliance upon the discovery claimed by the locator, as an inducement for him to expend his money.

Though it was apparently unnecessary to a decision of the case, yet it was held by the Supreme Court of Oklahoma, in Bay v. Oklahoma Southern Gas Company, 13 Okl. 425, 73 Pac. 936, 940, that in the absence of a discovery of some body or vein of oil, from which oil can be brought to the surface, the production of 1½ gallons of oil 43 feet below the surface was not a sufficient "discovery" under the law to validate a location.

In New England Oil Company v. Congdon, 152 Cal. 211, 92 Pac. 180, the evidence showed the discovery of " 'some oil sand stained with oil and a ridge of fossil,' and that oil had been discovered in neighboring locations, the nearest well being some two miles distant. The geological formation indicated the probable existence of oil-bearing strata in the claim." This evidence was held insufficient to validate a location or constitute a discovery. Undoubtedly the witnesses in this case, who have testified that a reasonably prudent man would have been justified in going ahead because of the discovery of gas herein, would also have testified that such a man would have been similarly justified under the conditions shown in the Congdon Case. The circumstances there developed, showing "the probable existence of oil-bearing strata in the claim," together with the finding of oil sand actually "stained with oil," would seem to put that case somewhat upon a parity with the case at bar; yet therein discovery was held to be insufficient. The cases of McLemore v. Express Oil Co., 158 Cal. 559, 112 Pac. 59, 139 Am. St. Rep. 147, and Miller v. Chrisman, 140 Cal. 440, 73 Pac. 1083, 74 Pac. 444, 98 Am. St. Rep. 63, also lend support to the views hereinabove announced.

Defendants claim that Borgwardt v. McKittrick, 164 Cal. 650, 130 Pac. 417, support their views that a sufficient discovery was had herein. Without taking the time to enter into a detailed discussion of that case, it suffices, however, to say that the lower court there *found* that in sinking a well upon the claim, at 775 feet below the surface, 25 feet of rich oil sands were discovered, capable of producing, so it was claimed, 40 barrels of oil per day. Of course, if such oil sands were discovered, and they were capable of producing 40 barrels of oil per day, and the lower court so found, and concluded that such constituted a "discovery," the Supreme Court could hardly do otherwise, as a matter of law, than to affirm its conclusions.

I have carefully examined cases cited having reference to Alaskan placers and to copper sulphides, but it must suffice to say that, in my judgment, they do not detract from the conclusions reached herein. With respect to this feature of the case, then, my judgment is that the

encountering by the defendants in the two abandoned Obispo wells of the small quantity of gas actually discovered, both because of its inconsequential nature and extent, and also because of the fact that it was at no time, until in the midst of this litigation, relied upon in any wise or sense by any of the defendants as a "discovery" validating their claim, cannot now, as a matter of law, authorize the court to enter a decree that such encountering sufficed to segregate the quarter section in question from the unappropriated public domain of the United States prior to the withdrawal order of September 27, 1909.

What has been determined hereinabove is merely that the government, as the proprietary owner of the property in question, had the right on September 27, 1909, to withdraw it from location, entry, exploration, and exploitation by its citizens; that it had the right to withdraw the unaccepted offer theretofore made with respect to the lands, and assert its own right as sovereign proprietor to the lands and their mineral content. This holding carries with it as a necessary corollary the right on the part of the government to a decree of this court that the defendants have no right in or to the property, and therefore no right further to exploit it to their own use or benefit. This takes care of the res itself and of its future use and disposition. It is the fact, however, in addition, as referred to heretofore, that upwards of $1,000,000 have been expended upon the land in the effort to produce oil therefrom; that many hundreds of thousands of barrels of oil have been taken from the land by the operating companies, and bought and thereafter sold by the purchasing companies.

[5] With respect to the damages which may have been sustained by the government because of the extraction and conversion by the operating companies of the oil and gas taken from the land, it will be both necessary and proper that the case shall go to a master for an inquiry and report by him as to the damage, if any, suffered, and the amounts thereof. In defining the scope of the inquiry to be undertaken by the master, I feel constrained to follow the decision of Judge Bean, sitting in this court in similar cases, and in which a similar judgment was directed to be entered. U. S. v. Midway Northern Oil Co. (D. C.) 232 Fed. 619.

There can be no valid claim, in my judgment, that the defendants herein were in any sense willful trespassers. Assuredly there is nothing in the facts developed to warrant that conclusion, and I know of no rule of law which could or should appeal to this court in equity which would have the effect of so adjudging them. True it is, as I have been constrained to hold, that without warrant they entered upon the lands of the United States and extracted the mineral content therefrom. True it was, however, also, that they did this in what I conceive to be good faith, and acting under the advice of counsel. There can be no doubt that bad advice emanating from reputable counsel will not suffice to confer any rights where otherwise none would exist. But there can be no doubt either that, in a court of equity at least, the imputation of being willful trespassers will not be indulged in as against those who are shown to have acted in good faith in reliance upon advice of reputable counsel.

238 F.—38

At the time the transactions complained of were had in this case, the validity of the withdrawal order of September, 1909, had not only not been upheld, but, on the contrary, had been determined by courts of great respectability to be without force or effect. The President of the United States, himself a great lawyer, had indicated *his* doubt as to his power to make the order, and there is small wonder, therefore, that counsel, eminent in their profession, should, after mature deliberation, have been led to advise clients that the order, being beyond the scope of executive function, might be disregarded. That it has since been determined, beyond the shadow of a doubt, to the satisfaction of all except those who will not see, that it is and was at all times valid and efficacious, does not detract from the proposition that men who in good faith, even though erroneously, labored under the misconception of its invalidity, are not to be punished now for anything more than the actual wrong they may have wrought. In addition, as suggested by Judge Bean in the opinion referred to, plaintiff, having seen fit to come into a court of equity to right its wrongs, must not expect that court to award other than equitable relief—must content itself with compensatory damages and not expect to receive those of an exemplary character.

In line with these views, thus briefly announced, a decree will be prepared substantially in the form indicated by Judge Bean in the Midway Northern Case. I have examined carefully his conclusions with respect to the damages to be allowed, and the relief, if any, to be accorded to the defendants by way of offset as for improvements erected upon the land.

The defendants, having indulged in what they did without warrant of law, and as trespassers, should not, of course, be permitted to take to themselves any profit because of their own wrongdoings. As to whether or not they are to be allowed the value of such improvements as they have placed upon the land, which may have a tendency actually to increase its value, not because of the discoveries they made, but because of the actual addition to the substance of the estate, has not been presented to or considered by the court, and will not be determined definitely at this time. As in the case of the Midway Northern, the decree will provide for a reference of all matters affecting the question of damages suffered by the government, and in addition, in order that the court may have the facts before it when it comes to render its judgment upon that feature of the case, the master will also make report upon the reasonable cost and expense of drilling the several wells sunk upon the property previous to the entry of the receiver thereon, and any other permanent and valuable improvements placed upon the property and affixed thereto.

But one other matter requires consideration. Counsel for the purchasing companies have made the point that, based upon the holding in U. S. v. Bitter Root, 200 U. S. 451, 26 Sup. Ct. 318, 50 L. Ed. 550, as against the purchasing companies, they having had nothing to do with any trespass upon the lands involved, and their sole offending having consisted in the purchase and sale of the oil produced therefrom, paying the market price therefor from time to time, they

are liable, if liable at all, only as for a conversion of the oil, and that this court has no jurisdiction, sitting as a court of equity, to award a judgment in damages as for a conversion.

In litigation of a similar nature decided by Judge Bean and hereinabove referred to, it was held by Judge Bean, on the authority of the Bitter Root Case, and on the grounds stated hereinabove, that the marketing companies were entitled to a dismissal, and an appropriate order was directed to be entered. The point has not been argued by counsel for government in this case, in so far as I can discover, either in the briefs or transcript of the oral argument; but, without intending to express any opinion definitely upon the subject in advance of argument upon this particular feature of the controversy, I merely content myself with saying that I am in doubt as to the correctness of Judge Bean's holding. This case is clearly differentiated from that of the Bitter Root controversy, there being there no attempt made to follow the res involved, and here the effort of the government being centered primarily about a recovery of the property, a quieting of its title thereto, and a recovery of damages for the trespasses committed as an incidental feature thereof. I am not so sure that, under the circumstances, it is not proper for this court now, sitting as a court of equity, to adjudicate with respect to the liability, if any, of the marketing companies, and this for the reason that so to do would be to avoid a multiplicity of suits—a distinct ground of equity jurisdiction. However that may be, the question will be considered to be held in abeyance until the coming in of the master's report.

The marketing companies have set up and argued with much force and clearness that they are absolved from liability here because of the fact that they were purchasers of the oil taken from this land in good faith, without notice, and for value. The government denies this contention, and asserts a right to recover of the marketing companies the full value of all oil purchased and paid for by them. As has been indicated heretofore, this is a court of equity, and complainant, having deliberately entered into this forum to secure a judicial recognition of its rights, must conform to the rules of righteousness under which the decrees of a court of this character are moulded.

Without-going into the minutiæ of the law with respect to the rights of the parties in this behalf, it will suffice to state that, irrespective of what else the government may have done after the making of the withdrawal order, it is indubitably true that it sat by and permitted wells to be sunk upon this property, and permitted the oil to be produced, and permitted it to be sold, without saying a word or raising a hand in opposition until at least October, 1913, when charges affecting the validity of the rights of the locators upon this land were filed in the Land Office. It must have known, as every one else knew, that upon the wells being sunk it was necessary that the oil should be taken therefrom, in order that irreparable damage to the oil sands might not result. Having been so taken and produced, it was necessary, of course, that it should be sold. It was impossible, in the very nature of things, that it should have been impounded or retained pending a determination of some controversy which might at some time arise with respect to the title. The marketing companies

were in the field, and had assumed properly a part of the burden resting upon the community to take and dispose of all oil as it was being produced from time to time. They purchased this oil at its full market price, in the utmost of good faith, I am constrained to believe, and after such due and legitimate inquiry into the state of the title of the vendors as it was possible for them to make in the exercise of due and reasonable diligence. True it was that they knew of the withdrawal order; but true it was, also, that they knew that the withdrawal order covered thousands of acres of land that had already passed to patent, or as to which vested rights had accrued, and with respect to which it was obvious that the government had no withdrawal rights. In the face of the things as they saw them, and in the face of a want of diligence on the part of the government to prevent the extraction of oil from land which it considered as its own, they are not, in this court of equity, to be charged with having done that which will make them liable as for a conversion of the oil. After the filing of the charges in the Land Department the situation changed, and they were then put upon notice, and in my judgment acted thereafter in the purchase of oil in disregard of what they ought to have understood were the plain and substantial rights of the government.

If, as seems to be suggested by the argument of counsel for the government, this great government of ours, with its multitudinous ramifications, was too big and had too much to do to be concerned with the question as to whether or not oil was being produced upon this little quarter section of land after the promulgation of the withdrawal order, by the same token it must now be held by this court to be too big to ask for compensation as for the deprivation of that portion of its estate which it sat by and permitted, without the exercise of any diligence upon its part at all, to be dissipated and to pass into the hands of its citizens, who in good faith paid full value therefor.

The master will make a report upon all oil produced from this property and purchased by the purchasing companies, together with the dates of such purchases, and upon the coming in of that report, upon the facts as herein adduced, the court will endeavor to do that which will appeal to its conscience, as well as satisfy the law as between these contending litigants.

Counsel for the government will prepare and present to the court the appropriate decree.